## COFFIN *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

No. 741. Argued December 6, 7, 1894. — Decided March 4, 1895.

The offence of aiding or abetting an officer of a national bank in committing one or more of the offences set forth in Rev. Stat. § 5209 may be committed by persons who are not officers or agents of the bank, and consequently it is not necessary to aver in an indictment against such an aider or abettor that he was an officer of the bank, or occupied any specific relation to it when committing the offence.

In an indictment for soliciting or inciting to the commission of a crime, or for aiding or assisting in its commission, it is not necessary to state the particulars of the incitement or solicitation, or of the aid or assistance.

The plain and unmistakable statement of this indictment as a whole is, that the acts charged against Haughey were done by him as president of the bank, and that the aiding and abetting was also knowingly done by assisting him in the official capacity in which alone it is charged that he misapplied the funds.

This indictment further examined and held to clearly state the misapplication and actual conversion of the money by the methods described, that is to say, by paying it out of the funds of the bank to a designated person when that person was not entitled to take the funds, and that owing to the insolvency of such person the money was lost to the bank.

Where there is an averment that a person or matter is unknown to a grand jury, and no evidence upon the subject is offered by either side, and noth-

ing appears to the contrary, the verity of the averment of want of knowledge in the grand jury is presumed.

A charge that there cannot be a conviction unless the proof shows guilt beyond a reasonable doubt does not so entirely embody the statement of presumption of innocence as to justify the court in refusing, when requested, to instruct the jury concerning such presumption, which is a conclusion drawn by the law in favor of the citizen, by virtue whereof, when brought to trial upon a criminal charge, he must be acquitted, unless he is proven to be guilty.

By section 5209 of the Revised Statutes, relating to National Banks, certain acts therein enumerated are made misdemeanors punishable by imprisonment for not less than five nor more than ten years. The section reads as follows :

"Every president, director, cashier, teller, clerk, or agent of any association who embezzles, abstracts, or wilfully misapplies any of the moneys, funds, or credits of the association ; or who, without authority from the directors, issues or puts in circulation any of the notes of the association ; or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree ; or who makes any false entry in any book, report, or statement of the association with intent in either case to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association ; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten."

The indictment in this case was found on the 21st December, 1893, against Theodore P. Haughey, who had been president of the Indianapolis National Bank, for violations of the foregoing section. F. A. Coffin and Percival B. Coffin, plaintiffs in error, and A. S. Reed were charged therein with having aided and abetted Haughey in his alleged misdemeanors. The indictment is prolix and redundant, and it is difficult to

analyze it so as to make a concise statement of its contents. It contains fifty counts, and alleges that the various offences enumerated in them were committed on different dates between January 1, 1891, and July 26, 1893. The counts embrace a number of acts made misdemeanors by the statute, and the charges are commingled in a very indefinite and confusing manner. All the counts, however, may be classified as follows:

(1) Those which aver wilful misapplication of the funds of the bank at a specified time, in a precise sum, and by enumerated and distinctly described acts.

(2) Those which, although definite as to date and amount, are indefinite in their statement of the precise means by which the alleged crimes were accomplished.

(3) Those which, whilst charging a wilful misapplication of the funds of the bank for a definite amount, are entirely indefinite as to the date or dates upon which the acts took place, and also fail to specify the particular acts by which the wrong was accomplished.

(4) Those which charge false entries in the books of the bank.

(5) Those which charge false entries in certain official statements of the condition of the bank made to the Comptroller of the Currency.

Under the first head — counts which are definite as to time, dates, amounts, and methods — are included Nos. 1, 2, 3, and 47. The first of these in order of date — for the counts are not arranged chronologically in the indictment — is the 47th, which reads as follows :

" The grand jurors aforesaid, upon their oaths aforesaid, do further charge and present that Theodore P. Haughey, late of said district, at the district aforesaid, on, to wit, the twenty-first day of December, in the year of our Lord one thousand eight hundred and ninety-two, the said Theodore P. Haughey then and there being president of a certain national banking association, then and there known and designated as the Indianapolis National Bank, in the city of Indianapolis, in the State of Indiana, which said association had been heretofore

created and organized under the laws of the United States of America, and which said association was then and there carrying on a banking business in the city of Indianapolis, State of Indiana, did then and there, by virtue of his said office as president of said bank, unlawfully, feloniously, and wilfully misapply the moneys, funds, and credits of the said association, which were then and there under his control, with intent to convert the same to the use of the Indianapolis Cabinet Company, and to other persons, to the grand jurors unknown, in a large sum, to wit, the sum of six thousand three hundred and eighteen dollars, by then and there causing said sum to be paid out of the moneys, funds, and credits of said association, upon a check drawn upon said association by the Indianapolis Cabinet Company, which check was then and there cashed and paid out of the moneys, funds, and credits of said association aforesaid, which said sum aforesaid, and no part thereof, was said Indianapolis Cabinet Company entitled to withdraw from said bank, because said company had no funds in said association to its credit. That said Indianapolis Cabinet Company was then and there insolvent as the said Theodore P. Haughey then and there well knew, whereby said sum became lost to said association; that all of said acts as aforesaid were done with intent to injure and defraud said association. That as such president aforesaid, the said Theodore P. Haughey was entrusted and charged by the board of directors of said national banking association with the custody, control and care of the moneys, funds, credits, and assets of said association, and the general superintendence of its affairs.

"And the grand jurors aforesaid do further say that Francis A. Coffin, Percival B. Coffin, and Albert S. Reed did unlawfully, willfully, knowingly, and feloniously and with intent to injure and defraud said association, on, to wit, the twenty-first day of December, in the year of our Lord one thousand eight hundred and ninety-two, aid and abet the said Theodore P. Haughey as aforesaid to wrongfully, unlawfully, feloniously, and wilfully misapply the moneys, funds, and credits of said association as aforesaid, to wit, the sum of six thousand three hundred and eighteen dollars."

The second and third counts are substantially like the foregoing, varying only in the statements of date, amount, and method. The first and remaining count under this head, after fixing the date of the offence and stating the amount at $5802.84, describes the method by which the misapplication was accomplished, as follows:

"The Indianapolis Cabinet Company of Indianapolis, Indiana, presented to said bank and to the said Theodore P. Haughey, as such president thereof, a certain bill of exchange, drawn by said Indianapolis Cabinet Company on the Indianapolis Desk Company of London, England, for the sum of one thousand one hundred and ninety-four pounds sterling, and due on June 1, 1893, which said bill of exchange was received by said Theodore P. Haughey, and placed to the credit of the said Indianapolis Cabinet Company upon the books of said bank, and the said Indianapolis Cabinet Company thereupon drew its check for said sum upon the said bank, which check was then and there paid by said bank, under the direction of said Theodore P. Haughey; that said Indianapolis Desk Company of London, England, did not owe said Indianapolis Cabinet Company any sum whatever; that said Theodore P. Haughey failed and refused to send said bill of exchange forward for collection whereby said sum was lost to said association; that said sum was so wilfully misapplied to the use and benefit of the Indianapolis Cabinet Company as aforesaid."

Under the second head — those definite as to date and amount but indefinite in the statement of the method by which the wrong was committed — are embraced counts 4, 5, 6, 7, 8, 9, 10, 11, and 12. Of these the 8th is the first in order of time and reads as follows:

"The grand jurors aforesaid, upon their oaths aforesaid, do further charge and present that Theodore P. Haughey, late of said district, at the district aforesaid, on, to wit, the twenty-third day of September, in the year of our Lord one thousand eight hundred and ninety-two, the said Theodore P. Haughey, then and there being the president of a certain national banking association, then and there known and designated as the Indianapolis National Bank, in the city of Indianapolis, in

the State of Indiana, which said association had been heretofore created and organized under the laws of the United States of America, and which association was then and there carrying on a banking business in the city of Indianapolis, State of Indiana, did then and there, by virtue of his said office as president of said bank, unlawfully, feloniously, and wilfully misapply the moneys, funds, and credits of the said association, without authority of the directors thereof, with intent to convert the same to the use of the Indianapolis Cabinet Company and to other persons, to the grand jurors unknown, in a large sum, to wit, the sum of three thousand nine hundred and sixty dollars and eighty-four cents, by then and there paying and causing said sum to be paid out of the moneys, funds, and credits of said association upon certain divers checks drawn upon said association by the Indianapolis Cabinet Company, which checks were then and there cashed and paid out of the moneys, funds, and credits of said association aforesaid, which said sum aforesaid, and no part thereof, was said Indianapolis Cabinet Company entitled to withdraw from said bank, because said company had no funds in said association to its credit. That said Indianapolis Cabinet Company was then and there insolvent as the said Theodore P. Haughey then and there well knew, whereby said sum became lost to said association; that all of said acts as aforesaid were done with intent to injure and defraud said association. That as such president aforesaid, the said Theodore P. Haughey was entrusted and charged by the board of directors of said national banking association, with the custody, control, and care of the moneys, funds, credits, and assets of said association, and the general superintendence of all its affairs. .

"And the grand jurors aforesaid do further say that Francis A. Coffin and Percival B. Coffin and Albert S. Reed at the district and State of Indiana aforesaid did unlawfully, wilfully, knowingly, and feloniously and with intent to injure and defraud said association on, to wit, the twenty-third day of September, in the year of our Lord one thousand eight hundred and ninety-two, aid and abet the said Theodore P. Haughey, as aforesaid, to wrongfully, unlawfully, feloniously,

and wilfully misapply the money, funds, and credits of said association, to wit, the sum of three thousand nine hundred and sixty dollars and eighty-four cents aforesaid."

The other counts under this classification substantially vary only as to date and amount.

Under the third head — those which, whilst charging a wilful misapplication of the funds of the bank for a definite amount, are indefinite as to the date or dates upon which the acts took place, and also fail to specify in any definite way the particular methods by which the wrong was accomplished — are embraced counts 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36. Of these counts the first in order of time is the 17th, which is as follows:

"The grand jurors aforesaid, upon their oaths aforesaid, do further charge and present that Theodore P. Haughey, late of said district, at the district aforesaid, on, to wit, the first day of January, in the year of our Lord one thousand eight hundred and ninety-one, and on divers times between said date and the twenty-fifth day of July, in the year of our Lord one thousand eight hundred and ninety-three, the said Theodore P. Haughey then and there being the president of a certain national banking association then and there known and designated as the Indianapolis National Bank of Indianapolis, in the State of Indiana, which said association had been heretofore created and organized under the laws of the United States of America, and which said association was then and there carrying on a banking business in the city of Indianapolis, State of Indiana, did then and there, by virtue of his said office as president of said bank, and without authority of the board of directors, unlawfully, feloniously, and wilfully misapply the moneys, funds, and credits of said association, with intent to convert the same to the use of the Indianapolis Cabinet Company, a more particular description of said moneys, funds, and credits being to the grand jurors unknown, in a large amount, to wit, the sum of three hundred and seventy-five thousand dollars, by then and there cashing, discounting, and paying for the use and benefit of said Indianapolis Cabinet Company, out of the funds of said association, a large

number of worthless and insolvent notes, drafts, and bills of exchange being drawn upon and by divers persons, firms, and companies, and corporations, each and all of whom were then insolvent, as the said Theodore P. Haughey then and there well knew, whereby said sum was wholly lost to said association; with intent then and there and thereby to injure and defraud said association. That as such president aforesaid, the said Theodore P. Haughey was entrusted and charged by the board of directors of said national banking association with the custody, control, and care of the funds, credits, and assets of said association, and the general superintendence of its affairs, and agent of said association in the transaction of all its business.

"And the grand jurors aforesaid do further say that Francis A. Coffin, Percival B. Coffin, and Albert S. Reed, at the district and State of Indiana aforesaid, did unlawfully, wilfully, knowingly, and feloniously and with intent to injure and defraud said association, on, to wit, the first day of January, in the year of our Lord one thousand eight hundred and ninety-one, and on divers times between said date and the twenty-fifth day of July, in the year of our Lord one thousand eight hundred and ninety-three, aid and abet the said Theodore P. Haughey, as aforesaid, to wrongfully, unlawfully, feloniously, and wilfully misapply the moneys, funds, and credits of said association, to wit, the sum of three hundred and seventy-five thousand dollars aforesaid."

The vagueness of the date as fixed in this charge is somewhat mitigated in four of the counts coming under this head — counts 13, 14, 15, and 16 — wherein the offence is stated to have been committed "on May 9, 1893, and at divers times between said date and June 18, 1893," "on June 19, 1893, and at divers times between said date and July 13, 1893," "on the 3d day of March, 1893, and on divers dates between said date and the 8th day of May, 1893;" and "on May 8, 1893, and at divers times between that date and June 18, 1893." In all the other counts the offence is said to have been committed between January 1, 1891, and July 25, 1893, except in one wherein the last date is averred to be July 26, 1893,

instead of July 25. The sum averred to have been misapplied in counts 13, 14, 15, and 16 is different from that charged in count 17, it being in the 14th, $9132.19; in the 15th, $12,732.51; in the 13th and 16th, $10,106.08. In the other counts, where the date of the offence is stated as being between 1891 and 1893, the amount of the alleged misapplication varies, being placed in some at $375,000, and in others at $350,000.

The method by which the misapplication is alleged to have been accomplished is not as indefinitely stated in all the other counts as in the 17th, which we have just quoted. In some, instead of charging that the checks or "insolvent" notes, drafts, and bills were drawn "by or upon divers persons, firms, companies, and corporations," it is specified that the checks or the notes discounted were drawn by the Indianapolis Cabinet Company. With this exception all the counts under this head are equally vague in regard to the specific methods of the misapplication. Some of them state that it was made by paying out the money of the bank on worthless checks of the Indianapolis Cabinet Company without giving the dates or the amounts of the checks. More allege that the misapplication was brought about by allowing overdrafts without giving the dates of such overdrafts or specifying the various checks through which the overdrafting was done. Others, again, allege that the misapplication was accomplished by loaning the money of the bank to the Indianapolis Cabinet Company in excess of ten per cent of the capital stock without giving the dates or the precise amounts of the loans. Again, it is charged that the misapplication was concealed by discounting and entering to the credit of the Indianapolis Cabinet Company a number of worthless notes and bills without stating who were the drawers of the notes, or giving the dates and amounts of the entries which it is charged were made for the purpose of concealing the misapplication. Indeed, whatever may be the difference between the counts under this head, there is, as has been stated, a uniformity in one respect — their failure to disclose the specific methods by which the alleged offences were committed by giving dates and amounts. The only partial exceptions to this are found in counts 35 and

37, wherein the general charge of payment of "a large number of worthless and insolvent drafts and bills of exchange in large amounts, a more particular description of which is to the grand jurors unknown, executed by and upon divers persons, firms, companies, and corporations in large amounts, to wit," is followed by an enumeration of certain persons or corporations, with a lump sum as against each person or corporation named. The intent with which the misapplication is charged to have been committed is not uniform in all the counts. In some it is averred that the misapplications were made to injure and defraud the bank and certain companies, bodies politic, bodies corporate, and individual persons, whose names are to the grand jurors unknown; in others, that it was made to defraud the bank alone; again, that entries of the worthless checks paid, or "insolvent" paper taken were made on the books of the bank with intent to conceal the misapplication and to deceive certain officers of the corporation, whose names are to the grand jurors unknown, or to deceive certain agents appointed or to be appointed by the Comptroller of the Currency, etc.

Under the 4th head — those which charge the making of false entries in the books of the bank — are embraced counts 37, 38, 39, 40, 41, 42, 43, 44, 45, and 46. The counts under this head vary only as to the particular false entry complained of, the date when made, and the folio of the account book where entered. Each particular false entry specified, except one, covers two counts, one charging it to have been made with intent to injure and defraud the association (bank), the other averring it to have been made to deceive any agent appointed or who might be thereafter appointed to examine the affairs of the bank, "the names of said agent or agents being to the grand jurors unknown."

The remaining counts belong to the fifth class, that is, relate to false entries which it is alleged were made in statements of the condition of the bank furnished to the Comptroller of the Currency.

A trial was begun under the indictment on the 10th of April, 1894, and progressed until the 25th of that month, when

by consent of all parties the jury was discharged because of the corrupt misconduct of one of the jurors. The court thereupon set the cause down for trial on the 1st of May. The defendants applied for a continuance upon two grounds: (1) because of the accidental wounding of the leading counsel for the accused, and his consequent inability to take part in the defence; and (2) because the general nature of the charges involved hundreds of transactions, covering thousands of dollars and a long period of time, necessitating the examination of over two thousand entries in the books of the bank which were in the hands of the officers of the government, who denied access thereto. The court refused the motion for continuance, and exception was duly reserved. The trial commenced on May 4.

During the course of the trial many exceptions were reserved to the admission or rejection of testimony. They went not only to the admissibility of the proffered testimony under particular counts, but were also taken to the admission of any evidence whatever, upon the theory that the entire indictment charged no offence, therefore no proof could be made under it. Other objections were also reserved to comments made by the court upon the evidence as it was adduced, etc. On the close of the case for the prosecution, the defendants moved the court to oblige the government " to elect and specify the particular transactions, in each count of the general counts, of the indictment in this case, to wit, from the 17th to 36th, both inclusive, upon which it relies as a substantive charge, and upon which it will claim a conviction of the defendants, or either of them ; said election to be made before the evidence on behalf of the defendants is commenced, to the end that they and each of them may know to what particular charge in each count their evidence is required to be addressed." To the refusal of the court to grant this motion exception was reserved. The reason for refusing the request is not stated, but in the charge of the court to the jury the following language was used, which indicates its opinion on the subject: " The particular acts of misapplication described in the several specific counts must be established by proof as therein respec-

tively charged. If, however, there are any wilful misapplications shown by the evidence which are not covered by special or specific counts, they may be included under the general counts, and a verdict thereon rendered accordingly."

Before the case went to the jury the prosecution abandoned the 47th, 48th, 49th, and 50th counts of the indictment, thus eliminating from it one of the specific counts and all those which referred to false entries in official statements as to the condition of the bank made to the Comptroller. On the close of the case the defendants proffered to the court forty-five written requests to charge, and upon the court's refusing them all, excepted to such refusal as to each, or rather as to forty-four thereof. To the charge of the court actually delivered to the jury, the defendants reserved twenty-six exceptions. A controversy exists as to whether one of the twenty-six exceptions was properly taken. The facts, as stated in the bill of exceptions, are as follows:

After the court had delivered its charge to the jury, and before it retired, the court said: "If it is the desire of counsel for defendant to reserve any exceptions to the charges given and refused, the practice in this court requires that that shall be done before the jury retires.

"Mr. Miller: It is, of course, if your honor please, the desire on behalf of defendants to reserve exceptions to the refusal of such instructions as were requested and refused and to parts of the instruction given. Without having a little time to examine these instructions, it is impossible for us now to designate the particular parts. We would like to have time to look at them for that purpose.

"The Court: What length of time would you desire?

"Mr. Miller: I do not know, if your honor please, how long it would take; it has taken an hour to read them.

"Mr. Duncan: They can be made when made, as of this time, with permission of the court.

"The Court: Except so far as any mere verbal changes are concerned, which, if the court's attention was drawn to, it would at once correct, I have no objection to that method of procedure.

"Mr. Miller : Of course, anything that is formal, of that character, that won't go to the substance of the matter, we should not expect to insist on. But, as your honor can see it, it is impossible for us from hearing the instructions read for an hour, to select the parts.

"The Court: There are the instructions you propose (indicating), and these instructions I do not care to have mislaid or lost (indicating).

"Mr. Miller: No, sir ; of course not. For that matter, every syllable of them has been taken down by two stenographers here, all of your instructions as you read them, so there cannot be any possibility of any trouble about them. We take them and make —

"The Court : Where is the bailiff ?

"Mr. Taylor: You may take these forms of the verdict and the indictment.

"Gentlemen of the jury, you may retire with your bailiff."

The bill of exceptions then states that at the time this colloquy took place the assistant attorney for the prosecution was present in the court-room, heard the conversation, and assented to the arrangement thus made.

It further states that a few minutes after three in the afternoon the jury retired to consider their verdict; that the defendants' counsel took the instructions given by the court, which were typewritten, and noted thereon, by enclosing the same in a parenthesis mark with pencil, the parts of such instructions so given by the court to which exceptions were taken, the parts thus marked being respectively numbered; that at nine o'clock that night the defendants' counsel returned to the court-room and handed the instructions which had been so marked and numbered by them to the judge in open court, saying that the parts marked in parentheses and numbered were those to which the defendants excepted, and to which they reserved their bill under the understanding previously had; that immediately thereafter the jury, which had not reached a conclusion, was brought into court and informed by the judge that he would be within call until eleven o'clock to receive a verdict, and if they did

not agree by that time, they might seal their verdict and bring it into court on Monday morning, it being then Saturday evening.

On May 28, the defendants, through their counsel, wrote out in full their exceptions to the various parts of the charge as marked and numbered and presented them to the court, which declined to sign them because of the 22d exception, which it considered not properly taken under the understanding between court and counsel above stated. However, the court signed the bill of exceptions, writing therein a narrative of the facts, and predicating its objection to the 22d exception on the ground that the matter covered by it was merely verbal, and at the time the parties were given the right to take their bill the court did not include any mere verbal error which would have been corrected if attention had been called to it in proper time. The language contained in the charge covered by the disputed exception is as follows:

"I do not wish to be understood as meaning that the intent to injure, deceive, or defraud is conclusively established by the simple proof of the doing of the prohibited act which results in injury. What I do mean is this: That when the prohibited acts are knowingly and intentionally done and their natural and legitimate consequence are to produce injury to the bank or to benefit the wrongdoer, the intent to injure, deceive, or defraud is thereby sufficiently established to cast on the accused the burden of showing that their purpose was lawful and their acts legitimate."

On the 28th day of May the jury returned a verdict against the plaintiffs in error of guilty as charged on all the counts of the indictment. After an ineffectual motion for a new trial, which restated the various grounds of objection raised to the admissibility of evidence under the indictment, and which had also been urged in the charges which had been requested and refused, the defendants moved in arrest. After argument upon this motion the court sustained the same as to the 17th, 18th, 19th, 20th, 21st, 22d, 23d, 24th, 25th, 26th, 27th, 28th, 29th, 30th, 31st, 32d, 33d, 34th, 35th, and 36th counts.

This reduced the indictment, first, to those counts which

were specific as to date, amount, and method ; second, to those which, whilst specific in amount and date, were not specific as to method; third, to four counts, Nos. 13, 14, 15, and 16, which were not specific as to date or method, leaving in addi-tion all the counts charging false entries in the books of the bank. The errors assigned here are seventy-eight in number, and cover all the objections which were made to the rulings of the court below during the trial, and the exceptions based on charges requested and refused, as well as charges given.

*Mr. W. H. H. Miller* and *Mr. Ferdinand Winter* (with whom was *Mr. John B. Elam* on the brief) for plaintiffs in error.

*Mr. Assistant Attorney General Conrad* for defendants in error.

Mr. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

Many of the exceptions taken during the trial and the re-quests to charge which were refused, as well as most of the exceptions to the charge as given, relate to the counts of the indictment which were quashed on the motion in arrest. All these questions are, therefore, eliminated. We shall hence only consider the matters which are pertinent to the remain-ing counts, and shall examine first the objections made to the indictment generally, based upon the contention that all the counts fail to charge an offence; second, the exceptions re-served to rulings of the court during the trial, the effect of which is to assail the verdict and judgment without reference to the validity of the indictment. In making this examina-tion we shall concentrate the errors complained of in proper order, thus obviating repetition — for the matters to be con-sidered are all reiterated by way of objection to the evidence, of exception to the refusal to charge as requested, and of complaints of the charges which the court actually gave.

1st. It is contended that no offence is stated against the aiders and abettors, because in none of the counts is it asserted that

they were officers of the bank or occupied any specific relation to the bank which made aiding and abetting possible. The language of the statute fully answers this contention. It provides that "every president, director, cashier, teller, clerk, or agent of any association, who," etc., and adds, after defining the acts which are made misdemeanors, "that every person who with like intent aids and abets," etc. The phrase, "every person," is manifestly broader than the enumeration made in the first portion of the statute. In other words, the unambiguous letter of the law is that every president, director, agent, etc., who commits the designated offences shall suffer the penalties provided; and that *every person* who aids or abets such officer, etc. The argument is that no one but an officer or an agent can be punished as an aider and abettor, and hence that every person who aids and abets, not being an officer, shall go unwhipped of justice. To adopt the construction contended for would destroy the letter and violate the spirit of the law. For the letter says, "every person who aids and abets," and the proposition is that we should make it say every officer or agent who aids and abets. The spirit and purpose of the statute is to punish the president, cashier, officer, or agent, etc., and likewise to punish every person who aids and abets. The assertion that one who is not an officer or who bears no official relation to the bank cannot, in the nature of things, aid or abet an official of the bank in the misapplication of its funds, is an argument which, if sound, should be addressed to the legislative and not the judicial department. We cannot destroy the law on the theory that the acts which it forbids cannot be committed. In other words, the construction which we are asked to give does not deal with the meaning of the statute, but simply involves the claim that it is impossible to prove the commission of the offence defined by the law. The question whether the proof shows the commission of an offence is one of fact and not of law. The citation made from *United States* v. *Northway*, 120 U. S. 327, 333, is not apposite. True, we there said: "The acts charged against Fuller could only be committed by him by virtue of his official relation to the bank; the acts charged against the

defendant likewise could only be committed by him in his official capacity." But in that case the indictment itself charged Northway, as president and agent, with aiding and abetting Fuller, the cashier of the bank, and the language quoted referred to the matter under consideration, and hence it was incidentally stated that the proof and averment must correspond.

Nor is the contention sound that the particular act by which the aiding and abetting was consummated must be specifically set out. The general rule upon this subject is stated in *United States* v. *Simmons*, 96 U. S. 360, 363, as follows: "Nor was it necessary, as argued by counsel for the accused, to set forth the special means employed to effect the alleged unlawful procurement. It is laid down as a general rule that ' in an indictment for soliciting or inciting to the commission of a crime, or for aiding or assisting in the commission of it, it is not necessary to state the particulars of the incitement or solicitation, or of the aid or assistance.' 2 Wharton, § 1281 ; *United States* v. *Gooding*, 12 Wheat. 460." The form-books give the indictment substantially as it appears here. Bishop's Forms, § 114, p. 52. Nothing in *Evans* v. *United States*, 153 U. S. 584, conflicts with these views. In that case the question was whether the 8th count stated misapplication of the funds, and not whether the particular acts by which the aiding and abetting were done were necessary to be set out in the indictment. On the contrary, the counts there held good charged the aiding and abetting in the very language found in the indictment in hand, " and the said Evans did then and there knowingly and unlawfully aid and abet the said cashier in such wilful misapplication with intent in him, the said Evans, to injure and defraud," etc.

2d. It is said that all the counts in the indictment are bad, because it is not charged that the aiders and abettors knew that Haughey was president of the bank at the time it is averred the acts were committed. The argument is this, the statute says that every person who with like intent aids or abets any officer, etc., therefore the fact that the aider or abettor knew that the person who misapplied the funds was

an officer, etc., must be specifically charged. Without considering the legal correctness of this proposition, it may be observed that it has no application to this cause. Each and every count here specifically avers that "the said Theodore P. Haughey, then and there being president of the bank," and "then and there by virtue of his said office as such president as aforesaid," "misapplied the funds" and having thus fully averred the relation of Haughey to the bank, and the commission of the acts complained of in his official capacity with intent to defraud, etc., the counts go on to charge that the plaintiffs in error did unlawfully, wilfully, feloniously, knowingly, and with intent to defraud, aid, and abet the "said Haughey as aforesaid." The words "as aforesaid" clearly relate to Haughey in the capacity in which it is stated that he committed the offence charged against him in the body of the indictment. Without entering into any nice question of grammar, or undertaking to discuss whether the word "said" before Haughey's name and the words "as aforesaid" which follow it are adverbial, we think the plain and unmistakable statement of the indictment as a whole is, that the acts charged against Haughey were done by him as president of the bank, and that the aiding and abetting was also knowingly done by assisting him in the official capacity in which alone it is charged that he misapplied the funds.

3d. It is further contended that all the counts of the indictment except the first are insufficient, because they fail to aver the actual conversion of the sum misapplied to the use of any particular person. This proposition is based on the cases of *United States* v. *Britton*, 107 U. S. 655, 666, and *United States* v. *Northway*, 120 U. S. 327. In the Britton case we said, that "the wilful misapplication made an offence by this statute means a misapplication for the use, benefit, or gain of the party charged, or of some company or person other than the association. Therefore to constitute the offence of wilful misapplication there must be a conversion to his own use or to the use of some one else of the moneys and funds of the association by the party charged. This essential element of the offence is not averred in the counts

under consideration, but is negatived by the averment that the shares purchased by the defendant were held by him in trust for the use of the association, and there is no averment of a conversion by the defendant to his own use or the use of any other person of the funds used in the purchase of the shares. The counts, therefore, charge maladministration of the affairs of the bank, rather than criminal misapplication of its funds." So in *Northway's case* we said, p. 332: "It is of the essence of the criminality of the misapplication that there should be a conversion of the funds to the use of the defendant or of some person other than the association." The various counts of the indictment here are all substantially alike in stating the conversion. We take the second as an example. That charges that Haughey, being president of the Indianapolis Bank, did then and there by virtue of his office as president of said bank unlawfully, feloniously, and wilfully misapply the moneys, funds, and credits of the bank, with intent to convert the same to the use of the Indianapolis Cabinet Company, by then and there causing said sum to be paid out of the moneys, funds, and credits of the bank, upon a check drawn upon the bank by the Indianapolis Cabinet Company, which check was then and there cashed and paid out of the funds and credit of the bank; which sum, and no part thereof, was the said Indianapolis Cabinet Company entitled to withdraw from the bank, because said company had no funds in the bank, and that the said company was then and there insolvent, which Haughey then and there well knew, whereby said sum became lost to the bank. This clearly states the misapplication and actual conversion of the money by the methods described, that is to say, by paying it out of the funds of the bank to a designated person when that person was not entitled to take the funds, and that owing to the insolvency of such person the money was lost to the bank. The fact that the count charges the intent to convert money to the use of the Indianapolis Cabinet Company does not obliterate the clear statement of the actual conversion. In this regard the count is clearer and

stronger than that held sufficient in *Evans* v. *United States,* *supra.*

4th. The following request was made and refused:

" Each of the forty-six counts of this indictment, except the 1st, the 40th, the 41st, and the 43d, alleges that certain facts therein referred to are unknown to the grand jury. Thus, the 2d, 3d, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, and 12th counts each aver a misapplication of the funds of said bank by said Haughey with intent to convert the same to the use of the Indianapolis Cabinet Company and to other persons to the grand jury unknown. The averment that the names of these persons were unknown to the grand jurors is a material averment, and is necessary to be proven by the government in order to make out its case in each of said counts, because in each of said counts the charge is of a misapplication of a single, definite, fixed sum with an intent to convert the same to the use, not merely of the cabinet company, but of other persons. If, as a matter of fact, no evidence has been placed before you showing or tending to show that the names of such persons were unknown to the grand jury, then, as to these counts, the government's case has failed."

In connection with this ruling the bill of exceptions states that there was no evidence whatever on the subject offered by either side, and nothing to indicate that there was knowledge in the grand jurors of the matter which the indictment declared to be to them unknown. The instruction was rightly refused. It presupposes that where there is an averment that a person or matter is unknown to a grand jury and no evidence upon the subject of such knowledge is offered by either side, acquittal must follow, while the true rule is that where nothing appears to the contrary, the verity of the averment of want of knowledge in the grand jury is presumed. Thus it was said in *Commonwealth* v. *Thornton,* 14 Gray, 41, 42: " The fact that the name of the person was in fact known, must appear from the evidence in the case. It is immaterial whether it so appears from the evidence offered by the government or that offered by the defendant. But there being no evidence to the contrary, the objection that the party was not unknown does

not arise." And subsequently, in *Commonwealth* v. *Sherman*, 13 Allen, 248, 250, the court observed: "It is always open to the defendant to move the judge before whom the trial is had to order the prosecuting attorney to give a more particular description, in the nature of a specification or bill of particulars, of the acts on which he intends to rely, and to suspend the trial until this can be done; and such an order will be made whenever it appears to be necessary to enable the defendant to meet the charge against him, or to avoid danger of injustice. *Commonwealth* v. *Giles*, 1 Gray, 469; *The King* v. *Curwood*, 3 Ad. & El. 815; Rosc. Crim. Ev. (6th ed.) 178, 179, 420." It is to be observed that none of the counts as to which the prosecution was called upon to specify remain, all having been eliminated by the action of the court on the motion in arrest.

This concludes the examination of all the general objections to the indictment which we deem it necessary to consider, and brings us to the exceptions taken to the refusals to charge, as well as those reserved to the charges actually given.

The 44th charge asked and refused was as follows:

"The law presumes that persons charged with crime are innocent until they are proven by competent evidence to be guilty. To the benefit of this presumption the defendants are all entitled, and this presumption stands as their sufficient protection unless it has been removed by evidence proving their guilt beyond a reasonable doubt."

Although the court refused to give this charge, it yet instructed the jury as follows: "Before you can find any one of the defendants guilty you must be satisfied of his guilt as charged in some of the counts of the indictment beyond a reasonable doubt." And, again: "You may find the defendants guilty on all the counts of the indictment if you are satisfied that beyond a reasonable doubt the evidence justifies it." And, finally, stating the matter more fully, it said: "To justify you in returning a verdict of guilty, the evidence must be of such a character as to satisfy your judgment to the exclusion of every reasonable doubt. If, therefore, you can reconcile the evidence with any reasonable hypothesis consistent

with the defendants' innocence, it is your duty to do so, and in that case find the defendants not guilty. And if, after weighing all the proofs and looking only to the proofs, you impartially and honestly entertain the belief that the defendants may be innocent of the offences. charged against them, they are entitled to the benefit of that doubt and you should acquit them. It is not meant by this that the proof should establish their guilt to an absolute certainty, but merely that you should not convict unless, from all the evidence, you believe the defendants are guilty beyond a reasonable doubt. Speculative notions or possibilities resting upon mere conjecture, not arising or deducible from the proof, or the want of it, should not be confounded with a reasonable doubt. A doubt suggested by the ingenuity of counsel, or by your own ingenuity, not legitimately warranted by the evidence or the want of it, or one born of a merciful inclination to permit the defendants to escape the penalty of the law, or one prompted by sympathy for them or those connected with them, is not what is meant by a reasonable doubt. A reasonable doubt, as that term is employed in the administration of the criminal law, is an honest, substantial misgiving, generated by the proof or the want of it. It is such a state of the proof as fails to convince your judgment and conscience, and satisfy your reason of the guilt of the accused. If the whole evidence, when carefully examined, weighed, compared, and considered, produces in your minds a settled conviction or belief of the defendants' guilt—such an abiding conviction as you would be willing to act upon in the most weighty and important affairs of your own life—you may be said to be free from any reasonable doubt, and should find a verdict in accordance with that conviction or belief."

The fact, then, is that whilst the court refused to instruct as to the presumption of innocence, it instructed fully on the subject of reasonable doubt.

The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.

It is stated as unquestioned in the text-books, and has been referred to as a matter of course in the decisions of this court and in the courts of the several States. See Taylor on Evidence, vol. 1, c. 5, 126, 127; Wills on Circumstantial Evidence, c. 5, 91; Best on Presumptions, part 2, c. 1, 63, 64; c. 3, 31–58; Greenleaf on Evidence, part 5, §§ 29, &c.; 11 Criminal Law Magazine, 3; Wharton on Evidence, § 1244; Phillips on Evidence, Cowen & Hill's Notes, vol. 2, p. 289; *Lilienthal* v. *United States*, 97 U. S. 237; *Hopt* v. *Utah*, 120 U. S. 430; *Commonwealth* v. *Webster*, 5 Cush. 295, 320; *State* v. *Bartlett*, 43 N. H. 224; *Alexander* v. *People*, 96 Illinois, 96; *People* v. *Fairchild*, 48 Michigan, 31; *People* v. *Millard*, 53 Michigan, 63; *Commonwealth* v. *Whittaker*, 131 Mass. 224; *Blake* v. *State*, 3 Tex. App. 581; *Wharton* v. *State*, 73 Alabama, 366; *State* v. *Tibbetts*, 35 Maine, 81; *Moorer* v. *State*, 44 Alabama, 15.

Greenleaf traces this presumption to Deuteronomy, and quotes Mascardus De Probationibus to show that it was substantially embodied in the laws of Sparta and Athens. Greenl. Ev. part 5, section 29, note. Whether Greenleaf is correct or not in this view, there can be no question that the Roman law was pervaded with the results of this maxim of criminal administration, as the following extracts show:

"Let all accusers understand that they are not to prefer charges unless they can be proven by proper witnesses or by conclusive documents, or by circumstantial evidence which amounts to indubitable proof and is clearer than day." Code, L. iv, T. xx, 1, l. 25.

"The noble (*divus*) Trajan wrote to Julius Frontonus that no man should be condemned on a criminal charge in his absence, because it was better to let the crime of a guilty person go unpunished than to condemn the innocent." Dig. L. xlviii, Tit. 19, l. 5.

"In all cases of doubt, the most merciful construction of facts should be preferred." Dig. L. l, Tit. xvii, l. 56.

"In criminal cases the milder construction shall always be preserved." Dig. L. l, Tit. xvii, l. 155, s. 2.

"In cases of doubt it is no less just than it is safe to adopt the milder construction." Dig. L. l, Tit. xvii, l. 192, s. 1.

Ammianus Marcellinus relates an anecdote of the Emperor Julian which illustrates the enforcement of this principle in the Roman law. Numerius, the governor of Narbonensis, was on trial before the Emperor, and, contrary to the usage in criminal cases, the trial was public. Numerius contented himself with denying his guilt, and there was not sufficient proof against him. His adversary, Delphidius, " a passionate man," seeing that the failure of the accusation was inevitable, could not restrain himself, and exclaimed,. " Oh, illustrious Cæsar! if it is sufficient to deny, what hereafter will become of the guilty?" to which Julian replied, "If it suffices to accuse, what will become of the innocent?" Rerum Gestarum, L. xviii, c. 1. The rule thus found in the Roman law was, along with many other fundamental and humane maxims of that system, preserved for mankind by the canon law. Decretum Gratiani de Presumptionibus, L. ii, T. xxiii, c. 14, A.D. 1198; Corpus Juris Canonici Hispani et Indici, R. P. Murillo Velarde, Tom. 1, L. ii, n. 140. Exactly when this presumption was in precise words stated to be a part of the common law is involved in doubt. The writer of an able article in the North American Review, January, 1851, tracing the genesis of the principle, says that no express mention of the presumption of innocence can be found in the books of the common law earlier than the date of McNally's Evidence (1802). Whether this statement is correct is a matter of no moment, for there can be no doubt that, if the principle had not found formal expression in the common law writers at an earlier date, yet the practice which flowed from it has existed in the common law from the earliest time.

Fortescue says: "Who, then, in England can be put to death unjustly for any crime? since he is allowed so many pleas and privileges in favor of life; none but his neighbors, men of honest and good repute, against whom he can have no probable cause of exception, can find the person accused guilty. Indeed, one would much rather that twenty guilty persons should escape the punishment of death than that one innocent person should be condemned and suffer capitally." De Laudibus Legum Angliæ, Amos' translation, Cambridge, 1825.

Lord Hale (1678) says: "In some cases presumptive evidence goes far to prove a person guilty, though there be no express proof of the fact to be committed by him, but then it must be very warily pressed, for it is better five guilty persons should escape unpunished than one innocent person should die." 2 Hale P. C. 290. He further observes: "And thus the reasons stand on both sides, and though these seem to be stronger than the former, yet in a case of this moment it is safest to hold that in practice, which hath least doubt and danger, *quod dubitas, ne faceris.*" 1 Hale P. C. 24.

Blackstone (1753–1765) maintains that "the law holds that it is better that ten guilty persons escape than that one innocent suffer." 2 Bl. Com. c. 27, margin page 358, *ad finem.*

How fully the presumption of innocence had been evolved as a principle and applied at common law is shown in *McKinley's case* (1817), 33 St. Tr. 275, 506, where Lord Gillies says: "It is impossible to look at it [a treasonable oath which it was alleged that McKinley had taken] without suspecting, and thinking it probable, it imports an obligation to commit a capital crime. That has been and is my impression. But the presumption in favor of innocence is not to be reargued by mere suspicion. I am sorry to see, in this information, that the public prosecutor treats this too lightly; he seems to think that the law entertains no such presumption of innocence. I cannot listen to this. I conceive that this presumption is to be found in every code of law which has reason, and religion, and humanity, for a foundation. It is a maxim which ought to be inscribed in indelible characters in the heart of every judge and juryman; and I was happy to hear from Lord Hermand he is inclined to give full effect to it. To overturn this, there must be legal evidence of guilt, carrying home a decree of conviction short only of absolute certainty."

It is well settled that there is no error in refusing to give a correct charge precisely as requested, provided the instruction actually given fairly covers and includes the instruction asked. *United States* v. *Tweed* (*Tweed's case*), 16 Wall. 504; *Chicago & North Western Railway* v. *Whitton*, 13 Wall. 270. The contention here is that, inasmuch as the charge given by the court

on the subject of reasonable doubt substantially embodied the statement of the presumption of innocence, therefore the court was justified in refusing in terms to mention the latter. This presents the question whether the charge that there cannot be a conviction unless the proof shows guilt beyond a reasonable doubt, so entirely embodies the statement of presumption of innocence as to justify the court in refusing, when requested, to inform the jury concerning the latter. The authorities upon this question are few and unsatisfactory. In Texas it has been held that it is the duty of the court to state the presumption of innocence along with the doctrine of reasonable doubt, even though no request be made to do so. *Black v. State*, 1 Tex. App. 368; *Priesmuth* v. *State*, 1 Tex. App. 480; *McMullen* v. *State*, 1 Tex. App. 577. It is doubtful, however, whether the rulings in these cases were not based upon the terms of a Texas statute, and not on the general law. In Indiana it has been held error to refuse, upon request, to charge the presumption of innocence, even although it be clearly stated to the jury that conviction should not be had unless guilt be proven beyond reasonable doubt. *Long* v. *State*, 46 Indiana, 489, 582; *Line* v. *State*, 51 Indiana, 172. But the law of Indiana contains a similar provision to that of Texas. In two Michigan cases, where the doctrine of reasonable doubt was fully and fairly stated, but no request to charge the presumption of innocence was made, it was held that the failure to mention the presumption of innocence could not be assigned for error, in the reviewing court. *People* v. *Potter*, 89 Michigan, 353; *People* v. *Graney*, 91 Michigan, 646. But in the same State, where a request to charge the presumption of innocence was made and refused, the refusal was held erroneous, although the doctrine of reasonable doubt had been fully given to the jury. *People* v. *Macard*, 73 Michigan, 15. On the other hand, in Ohio it has been held not error to refuse to charge the presumption of innocence where the charge actually given was, "that the law required that the State should prove the material elements of the crime beyond doubt." *Morehead* v. *State*, 34 Ohio St. 212. It may be that the paucity of authority upon this subject results from

the fact that the presumption of innocence is so elementary that instances of denial to charge it upon request have rarely occurred. Such is the view expressed in a careful article in the Criminal Law Magazine for January, 1889, vol. 11, p. 3: "The practice of stating this principle to juries is so nearly universal that very few cases are found where error has been assigned upon the failure or refusal of the judge so to do." But whatever be the cause, authorities directly apposite are few and conflicting, and hence furnish no decisive solution of the question, which is further embarrassed by the fact that in some few cases the presumption of innocence and the doctrine of reasonable doubt are seemingly treated as synonymous. *Ogletree* v. *State*, 28 Alabama, 693; *Moorer* v. *State*, 44 Alabama, 15; *People* v. *Lenon*, 79 California, 625, 631. In these cases, however, it does not appear that any direct question was made as to whether the presumption of innocence and reasonable doubt were legally equivalent, the language used simply implying that one was practically the same as the other, both having been stated to the jury.

Some of the text-books also in the same loose way imply the identity of the two. Stephen in his History of the Criminal Law tells us that: "The presumption of innocence is otherwise stated by saying the prisoner is entitled to the benefit of every reasonable doubt." Vol. 1, 437. So, although Best in his work on Presumptions has fully stated the presumption of innocence, yet in a note to Chamberlayne's edition of that author's work on Evidence (Boston, 1883, page 304, note *a*) it is asserted that no such presumption obtains, and that "apparently all that is meant by the statement thereof, as a principle of law, is this — if a man be accused of crime he must be proved guilty beyond reasonable doubt."

This confusion makes it necessary to consider the distinction between the presumption of innocence and reasonable doubt as if it were an original question. In order to determine whether the two are the equivalents of each other, we must first ascertain, with accuracy, in what each consists. Now the presumption of innocence is a conclusion drawn by the law in favor of the citizen, by virtue whereof, when brought to trial

upon a criminal charge, he must be acquitted, unless he is proven to be guilty. In other words, this presumption is an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created. This presumption on the one hand, supplemented by any other evidence he may adduce, and the evidence against him on the other, constitute the elements from which the legal conclusion of his guilt or innocence is to be drawn.

Greenleaf thus states the doctrine: "As men do not generally violate the penal code, the law presumes every man innocent; but some men do transgress it, and therefore evidence is received to repel this presumption. This legal presumption of innocence is to be regarded by the jury, in every case, *as matter of evidence, to the benefit of which the party is entitled.*" 1 Greenl. Ev. § 34.

Wills on Circumstantial Evidence says: "In the investigation and estimate of criminatory evidence there is an antecedent *prima facie* presumption in favor of the innocence of the party accused, grounded in reason and justice, not less than in humanity, and recognized in the judicial practice of all civilized nations; which presumption must prevail until it be destroyed by such an overpowering amount of legal evidence of guilt as is calculated to produce the opposite belief." Best on Presumptions declares the presumption of innocence to be a "*presumptio juris.*" The same view is taken in the article in the Criminal Law Magazine for January, 1889, to which we have already referred. It says: "This presumption is in the nature of evidence in his favor [*i.e.* in favor of the accused], and a knowledge of it should be communicated to the jury. Accordingly, it is the duty of the judge in all jurisdictions, when requested, and in some when not requested, to explain it to the jury in his charge. The usual formula in which this doctrine is expressed, is that every man is presumed to be innocent until his guilt is proved beyond a reasonable doubt. The accused is entitled, if he so requests it . . . to have this rule of law expounded to the jury in this or in some equivalent form of expression."

The fact that the presumption of innocence is recognized
as a presumption of law and is characterized by the civilians
as a *presumptio juris*, demonstrates that it is evidence in
favor of the accused.   For in all systems of law legal presump-
tions are treated as evidence giving rise to resulting proof to
the full extent of their legal efficacy.

Concluding, then, that the presumption of innocence is
evidence in favor of the accused introduced by the law in his
behalf, let us consider what is "reasonable doubt."   It is of
necessity the condition of mind produced by the proof result-
ing from the evidence in the cause.   It is the result of the
proof, not the proof itself; whereas the presumption of inno-
cence is one of the instruments of proof, going to bring about
the proof, from which reasonable doubt arises; thus one is a
cause, the other an effect.   To say that the one is the equiva-
lent of the other is therefore, to say that legal evidence can
be excluded from the jury, and that such exclusion may be
cured by instructing them correctly in regard to the method
by which they are required to reach their conclusion upon
the proof actually before them.   In other words, that the
exclusion of an important element of proof can be justified
by correctly instructing as to the proof admitted.   The evo-
lution of the principle of the presumption of innocence and
its resultant, the doctrine of reasonable doubt, makes more
apparent the correctness of these views, and indicates the
necessity of enforcing the one, in order that the other may
continue to exist.   Whilst Rome and the Mediævalists taught
that wherever doubt existed in a criminal case, acquittal
must follow, the expounders of the common law, in their de-
votion to human liberty and individual rights, traced this
doctrine of doubt to its true origin, the presumption of inno-
cence, and rested it upon this enduring basis.   The inevitable
tendency to obscure the results of a truth, when the truth
itself is forgotten or ignored, admonishes that the protection
of so vital and fundamental a principle as the presumption of
innocence be not denied, when requested, to any one accused
of crime.   The importance of the distinction between the two
is peculiarly emphasized here, for, after having declined to

instruct the jury as to the presumption of innocence, the court said: "If after weighing all the proofs and looking only to the proofs, you impartially and honestly entertain the belief," etc. Whether thus confining them to "the proofs" and only to the proofs would have been error if the jury had been instructed that the presumption of innocence was a part of the legal proof, need not be considered, since it is clear that the failure to instruct them in regard to it excluded from their minds a portion of the proof created by law, and which they were bound to consider. "The proofs and the proofs only" confined them to those matters which were admitted to their consideration by the court, and among these elements of proof the court expressly refused to include the presumption of innocence, to which the accused was entitled, and the benefit whereof both the court and the jury were bound to extend him.

In addition, we think the 22d exception to the rulings of the court was well taken. The error contained in the charge, which said substantially that the burden of proof had shifted under the circumstances of the case, and that therefore it was incumbent on the accused to show the lawfulness of their acts was not merely verbal, but was fundamental, especially when considered in connection with the failure to state the presumption of innocence.

There are other objections specifically raised to certain particular counts in the indictment which we do not deem it necessary to elaborately examine, but to which the condition of the case compels us to briefly allude. Thus, the first count charges the receipt and placing to the credit of the Indianapolis Cabinet Company of a bill of exchange amounting to a certain number of pounds sterling, followed by the averment that the company thereupon drew its check for said amount. It is contended that the check offered to show the payment of this money was for dollars and not for pounds sterling, and, therefore, there was a variance between the indictment and the proof. This contention, we think, is without merit. The count charged the misapplication of the sum of $5802.84, and averred that the misapplication was

effected by taking the bill of exchange and paying out that amount; in other words, the whole context, we think, makes plain the charge that the sum which it avers to have been misapplied was credited as the result of taking the bill of exchange, and that it was this sum which was paid out upon the check of the cabinet company. Of course it is immaterial at what rate or by what rule the pounds sterling were converted into current money. The sum of the misapplication was the amount stated as credited in consequence of having taken the bill of sterling exchange.

On the subject of the counts covering the charge of false entries in the books of the bank the following requests were made and refused:

"No. 18. In considering the false entry charges in the indictment, it is necessary that you should know what constitutes a false entry. The books of account of a bank are kept for the purpose of accurately and truly recording the financial transactions of the bank. An entry upon the books of the bank of some alleged transactions which never occurred, or of a transaction which did occur, but which is falsely recorded, would be a false entry. But any entry in which that which has been done by the officers or agents of the bank is correctly set forth in detail is not a false entry. If, therefore, you find from the evidence, for instance, with reference to the alleged false entry in the 40th count, that the bank had actually given to the cabinet company the credit for $44,000 upon the paper presented by the cabinet company, and had authorized said cabinet company to make its checks against said credit, and that said entry was made upon the books simply as a truthful record of that which had been done, then the same was not a false entry but was and is a true entry, and the indictment, so far as based upon such entry, cannot be sustained.

"No. 19. If Mr. Haughey, as president of the bank, received from the cabinet company drafts, bills, or notes, which, by reason of the insolvency of the parties, or for any other reason ought not to have been received, and gave to said cabinet company credit therefor, and afterwards caused

an entry of such credit to be made upon the books of the bank, then whatever wrong was done in the matter by Mr. Haughey was not in causing such entry to be made, but was, further back, in receiving the paper and giving the credit. Not to have made the entry would have been to commit another wrong, since it was his duty as president of the bank to see that the books should speak the exact truth as to that which he had caused to be done, and, however wrongful may have been his previous acts, the making of an exact and truthful record of the same in the books of the bank was and could be no crime under this statute."

Whilst we consider the charges asked were in some respects unsound, yet the exception reserved to the charge actually given by the court was well taken, because therein the questions of misapplication and of false entries are interblended in such a way that it is difficult to understand exactly what was intended. We think the language used must have tended to confuse the jury and leave upon their minds the impression that if the transaction represented by the entry actually occurred, but amounted to a misapplication, then its entry exactly as it occurred constituted " a false entry;" in other words, that an entry would be false, though it faithfully described an actual occurrence, unless the transaction which it represented involved full and fair value for the bank. The thought thus conveyed implied that the truthful entry of a fraudulent transaction constitutes a false entry within the meaning of the statute. We think it is clear that the making of a false entry is a concrete offence which is not committed where the transaction entered actually took place, and is entered exactly as it occurred.

*Judgment reversed and case remanded with directions to grant a new trial.*