Com. of Pa. *v.* Bardolph, Appellant.

Argued October 30, 1933.

Before TREXLER, P. J., KELLER, CUNNING-
HAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

Judge KELLER filed a dissenting opinion, Judges
CUNNINGHAM and STADTFELD concurring therein.

*Charles B. Prichard,* for appellant, cited: Commonwealth v. Paolini, 96 Pa. Superior Ct. 270; Coffin v. United States, 156 U. S. 432; Twining v. United States, 141 Federal 41.

*H. R. Phillips,* Assistant District Attorney, and with him *Andrew T. Park,* District Attorney, *William A. Schnader,* Attorney General, and *David Glick,* Special Deputy Attorney General, for appellee, cited: Dow v. United States, 82 Federal 904; Hayes v. United States, 169 Federal 101.

OPINION BY BALDRIGE, J., December 16, 1933:

The indictment in this case consists of 32 counts. The appellant was convicted on 11 counts charging the making of false entries in the general ledger of the Franklin Savings and Trust Company, in the account of Agricultural Exchange, and acquitted on the other counts. It was from the sentence imposed under this conviction that this appeal was taken.

Since July, 1929, the appellant had been president of the Franklin Savings and Trust Company, which was closed and taken over by the State Banking Department on September 21, 1931. Many of the customers of this institution were waste product dealers and produce merchants, in which latter business the Agricultural Exchange was engaged. It was the custom of these particular patrons to make sales of their produce or products in carload lots and to issue drafts on the purchasers. For many years, prior to the defendant's becoming its president, it had been the practice of the Franklin Savings and Trust Company to accept these drafts, like checks, for deposit, and this practice had been continued until the bank closed. When the drafts were presented to the bank for deposit, they were listed as drafts on the deposit slips, with the names of the drawees and the amounts there-

of. These deposit slips were then presented to defendant and received his O.K. The aggregate amount of the drafts, as they appeared on the slips, was credited to the individual account of the customer, and the same or the next day they were charged to the Country Checking Account in the general ledger. This was a well known account, marked by an indexing tab. The minute book shows that every week a financial statement, which included the Country Checking Account, was brought to the attention of the directors of the trust company. Under the Commonwealth's testimony, the Country Checking Account was "composed mostly of drafts for collection." The defendant explained that this was an asset account to offset credit advanced to the various customers, and the items, including bond coupons and drafts received for collection, were charged to the Country Checking Account in order to balance the bank's books.

The important question raised by this appeal is, was there sufficient evidence to support the verdict? These 11 counts were drawn under section 1 of the Act of April 23, 1909, P. L. 169, as amended April 16, 1929, P. L. 524, (18 PS §2516), which provides, that "any president......of any.......trust company......who shall make any false entry in any book, report, or statement of such institution, with intent in either case, to injure or defraud such institution, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such institution, or any bank examiner or other person legally authorized to examine the affairs of any such institution, shall be deemed guilty of a misdemeanor," etc.

It was necessary for the Commonwealth to prove (1) false entry; (2) an intent to injure or defraud. "A false entry includes any entry made intentionally, either personally or by direction, to represent what is not true or does not exist, with the intent either to deceive the officers or to defraud the bank:" 7 C. J.

§696, p. 801. It is necessary to determine, therefore, whether the entries so made were, in fact, false, as "the offense is not committed by making entries which correctly record actual transactions, although the transactions may have been unauthorized, or even fraudulent": 7 C. J. §698, p. 801.

There is a dearth of decisions in our own appellate courts, as only two cases have been found by counsel and by us, in which the charge of making false entry in the records of a bank, under our statute, have been considered, to wit: Com. v. Moyer, 76 Pa. Superior Ct. 20; Com. v. Paolini, 96 Pa. Superior Ct. 270. In both of those cases the entries were manifestly false and clearly within the provisions of the statute. However, section 5209 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 3497), which, it will be noted, is strikingly similar to our act of assembly under which these counts were drawn, provides, that "every president......of any association......who makes any false entry in any book, report or statement of the association, with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or individual person, shall be deemed guilty of a misdemeanor." There have been a number of prosecutions under this statute, charging false entries by bank officials. Probably, the leading case is Coffin et al. v. U. S., 156 U. S. 432, 463, 39 L. Ed. 481, 494, wherein Mr. Justice WHITE, in passing upon the question of false entry, said: "We think the language used [by the trial judge] must have tended to confuse the jury and leave upon the minds the impression that if the transaction represented by the entry actually occurred, but amounted to a misapplication, then its entry exactly as it occurred constituted 'a false entry'; in other words, that any entry would be false, though it faithfully described an actual occurrence, unless the transaction which it represented involved full and fair value for the bank. The thought

thus conveyed implied that the truthful entry of a fraudulent transaction constitutes a false entry within the meaning of the statute. We think it is clear that the making of a false entry is a concrete offense which is not committed where the transaction entered actually took place, and is entered exactly as it occurred." See, also, Dow v. U. S. (1897), 82 F. 904; U. S. v. Young (1904), 128 F. 111; Hayes v. U. S. (1909), 169 F. 101.

The Commonwealth depended very largely upon the books and writings of the bank to establish its case. It contended that an analysis of these transactions, involving the drafts received from the Agricultural Exchange, extending from August 13th to September 19, 1931, which are the basis of the charges of making false entries, shows a loan of money made to the Agricultural Exchange on the strength of each draft left for collection; that the books of the bank did not give such a complete history of the transactions that a person examining the books could determine the exact nature thereof, or the assets and liabilities of the bank; and that defendant's action was but a mere device for keeping the books in balance, that was deceptive and false; that the books revealed only that a deposit had actually been made either in money or its equivalent in the amount of the deposit and was an asset of the bank, which, in fact, was false.

While the accounts in the books may not have shown a complete history of what occurred, undoubtedly these transactions took place and the entries thereof were made in the books. Mr. Williams, an employee of the State Banking Department, testified that the account of the Agricultural Exchange appeared in the bank in its regular place, and drafts and deposit slips were found in order and properly filed, and that no attempt had been made apparently by the defendant or any person in the bank "to conceal any of the these transactions, by disguising them on the record, or omitting them from the record."

We conclude, in view of the documentary evidence and the Commonwealth's witnesses, that these transactions did not represent what was not true, but reported what actually occurred. To hold otherwise, every bank official who gives a customer credit for coupons deposited before actually collected would be guilty of crime. We are convinced that such action is not within the purview of the statute. It, undoubtedly, is better banking, if items, like drafts and coupons, be received, to enter them for collection only. But the giving of immediate credit, if the transaction is accurately recorded, is not a false entry.

Nor do we think the Commonwealth proved an intent to injure or defraud the institution, of which the defendant was president, a large stockholder and depositor. This custom of accepting drafts as deposits money, which had existed ever since the bank had opened, prior to the defendant's election as president, and was known and approved by the directors and understood by the other employees, does not show any concealment or conduct that tends to prove any intent to perpetrate a fraud. There is no proof or contention that defendant received any personal benefit or advantage. It is true, as alleged, that in August, 1931, he O. K.'d drafts drawn on the City Fruit Company when other drafts of that company had been refused; but, under the testimony, these unpaid drafts were in the process of settlement. In any event, this action did not show a fraudulent intent.

Nor did the failure to charge the Agricultural Exchange with the drafts returned indicate an intent to defraud. It may have been bad banking and the defendant may have exercised poor judgment in the dealings with this concern, but the Agricultural Exchange was indebted to the bank in many thousands of dollars before the defendant became its head, and, under his testimony, which was not contradictory to

that of the Commonwealth's, but largely explanatory of the documentary evidence, he was endeavoring to extricate the bank from an unfortunate situation by keeping this company alive. But so far as his failure to debit the uncollected drafts to the account of the Agricultural Exchange, which was insufficient to pay them, they were matters occurring after making the alleged false entries. This omission did not change an, original faithful entry to a false entry.

We have given careful consideration to this entire record and have reached the conclusion that the Commonwealth's evidence was not inconsistent with the defendant's innocence, which is necessary to justify a conviction: Com v. Bone, 64 Pa. Superior Ct. 44, 48. The defendant's points requesting the court to instruct the jury to render a verdict of not guilty on the counts involved in this appeal should have been affirmed.

Judgment is reversed and defendant is discharged.

---

DISSENTING OPINION BY KELLER, J., December 16, 1933:

I would affirm the judgment.

The record shows a course of conduct by the defendant that would warrant a jury in finding that ostensible deposits, represented by drafts drawn by Agricultural Exchange, for many thousand dollars, were in reality loans made by defendant as president of the bank to Agricultural Exchange, with no entry on the books of the bank of any loans made to it at all. When the drafts were refused and returned unpaid they were not charged back against the drawer, the Agricultural Exchange, to whose account they had been credited as cash, but were hidden in the ledger account entitled "Country Checks." The account of the Agricultural Exchange did not even show an overdraft, although it owed the bank for these dishonored

drafts many thousand dollars. New drafts drawn on the same parties whose refused and dishonored drafts were already choking the "Country Check" account, were by the defendant's orders accepted and credited as cash deposits. In this way loans in excess of what the Agricultural Exchange could have legally borrowed were made to it without any entry on the books of the bank that it owed a dollar. What were actually loans falsely appeared on the books as deposits.

In United States v. Darby, 289 U. S. 224, the Supreme Court held that the federal statute referred to, in the majority opinion was violated by a defendant who entered a note with a forged endorsement in the books of the bank. The opinion in that case, written by Mr. Justice CARDOZO, distinguishes the Coffin case cited in the majority opinion, and says: " 'The crime of making false entries by an officer of a national bank, with the intent to defraud, ...... includes any entry on the books of the bank which is intentionally made to represent what is not true, or does not exist, with the intent either to deceive its officers or to defraud the association.' Agnew v. United States, 165 U. S. 36, 52; ...... Its [the statute's] aim was to give assurance that upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition. United States v. Corbett, 215 U. S., 233, 241, 242; Billingsley v. United States, supra. [C. C. A., 178 F. 653, 659, 662]. One will not find the picture here. Upon the face of the books there was a statement to examiners that paper with two signatures had been discounted by the bank, and was then in its possession. In truth, to the knowledge of the maker of the entries, there were not two signatures but one."

The books of the bank are intended to show a true picture of the bank's dealings with its customers; and an entry which ostensibly shows a deposit by a cus-

tomer, when in reality a loan of the bank's money has been made the customer, which is not entered on its books, is, in my opinion, a false entry within the meaning and intent of our statute.

The defendant's personal interest, as a creditor of the Agricultural Exchange, supplies the intent to benefit it at the expense of the bank.

Judges CUNNINGHAM and STADTFELD join in this dissent.