ARCHIBALD LIVINGSTON, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

145 So. 761.

En Banc.

Opinion filed February 3, 1933.

J. B. Hodges, R. C. Horne, J. McHenry Jones, Lester Summersill and Doggett, McCollum, Howell and Doggett, for Plaintiff in Error;

Cary D. Landis, Attorney General, and Roy Campbell, Assistant, for the State.

JOHNSON, Circuit Judge.—The plaintiff in error, Archibald Livingston, hereinafter called the defendant, was indicted by a grand jury of Madison County, Florida. The indictment was presented in open court by the grand jury on the 17th day of October, 1930. The defendant was tried on the third count of the indictment, was convicted and sentenced to serve four years in the State penitentiary.

The third count of the indictment, upon which the defendant was tried and convicted, was as follows:

" 'And the grand jurors aforesaid, upon their oaths aforesaid, do further present that Archibald Livingston, on the 13th day of March, in the year of our Lord one thousand and nine hundred and twenty-nine, at and in the county of Madison and State of Florida, then and there being, and being then and there President and a director of Citizens Bank of Madison, of Madison, Florida, which said bank was then and there a banking corporation, organized, existing and doing business in, and under the laws of, the

State of Florida, and domiciled in Madison County, State of Florida, did then and there unlawfully, fraudulently and wilfully misapply certain of the money, funds and credits of the Citizens Bank of Madison, of Madison, Florida, of the value of Five Thousand dollars, of the property of Citizens Bank of Madison, of Madison, Florida, a better description whereof is to the grand jurors unknown except as hereinafter described, with intent then and there in him, the said Archibald Livingston, to injure and defraud the said banking corporation and some other person or persons to the grand jurors unknown, in the manner and by the means following, that is to say: that he, the said Archibald Livingston, by virtue of the power of control, direction and management, which he, the said Archibald Livingston then and there had over the money, funds, credits, business and affairs of the said banking corporation, as President and a director thereof, did on the 26th day of February, 1929, issue a certain bank draft, of the said banking corporation, payable to Atlantic National Bank of Jacksonville, Florida, drawn on The Citizens and Southern National Bank of Atlanta, Georgia, in the sum of $7,000.00, which was duly honored by the said last mentioned bank and charged to the account of Citizens Bank of Madison, of Madison, Florida; that by direction of the said Archibald Livingston the said sum of $7,000.00 was applied to the payment of a promissory note due by Archibald Livingston to The Atlantic National Bank of Jacksonville on February 27th, 1929; that Archibald Livingston thereby became liable to the said Citizens Bank of Madison for the payment of the said sum of $7,000.00, but that instead of paying all of the said sums, he, the said Archibald Livingston placed among the assets of Citizens Bank of Madison, of Madison, Florida, without the consent of said banking corporation or of its board of directors and without the knowledge thereof, a certain promis-

sory note in the amount of $5,000.00, executed by A. Livingston, Jr., dated March 11, 1929, who was and is the son of the said Archibald Livingston, a better description of which said promissory note is to the grand jurors unknown; that the said A. Livingston, Jr., was then and there insolvent, and known to the said Archibald Livingston to be insolvent; that the said note was so placed among the assets of the Citizens Bank of Madison, of Madison, Florida, with the fraudulent purpose and design to convert to the use, benefit and advantage of Archibald Livingston, the said sum of $5,000.000 hereinbefore alleged to have been misapplied by him the said Archibald Livingston; and which said sum of $5,000.00 as aforesaid thereby became and was wholly lost to the said banking corporation; the said promissory note of the said A. Livingston, Jr., being wholly worthless; a better description of the manner and means used to effectuate and consummate the said wilful misapplication of said property being to the grand jurors unknown.' "

A change of venue was granted from Madison County to Lafayette County, in which latter county the defendant was tried.

The first assignment of error is, "The Court erred in sustaining the State's demurrer to defendant's plea in abatement the same being a plea of misnomer." The substance of this plea was that the defendant "respectfully shows unto the Court that he is not named or called Archibald Livingston, that in truth and in fact his true and right name is Archie Livingston, by which name this defendant has been known and called at all times." A demurrer to this special plea in abatement was sustained. In the case of Waldron v. State, 41 Fla. 265, 26 Sou. Rep. 701, this Court held: Plea in abatement for misnomer must state the true name of the accused and that he was not commonly known and

called by the name under which he was indicted. There was no error in sustaining demurrer to this plea.

The second assignment of error is that "The Court erred in overruling defendant's motion for a bill of particulars." We find no error in this ruling.

The third assignment of error is that "The Court erred in and by the entry of its order and ruling, jointly and severally, upon the several pleas of the defendant's plea in ababtement."

The defendant filed eight pleas in abatement, each plea attacking the validity of the indictment. The Court on his own motion took these pleas and considered them and overruled them. No motion was made by the State to strike said pleas, nor did the State file a demurrer to the said pleas nor to any one of them. It could serve no good purpose to recite the substance of all of the said eight pleas. We do not consider that pleas from two to seven, inclusive, had any merit. Pleas one and eight are the same, except that plea eight is more specific as to details in the matter set up. Pleas two and eight contain two propositions, first, that there were only four members of the board of county commissioners present, at the regular meeting on January 6th, 1930, at which time the jury list for the year 1930 was made up, and from which list the grand jurors who presented the indictment in this case were drawn. This prosecution is on the theory that all five of the county commissioners had to be present to perform this service. There is no merit in this proposition. The second proposition contained in these two pleas, pleas two and eight, is, "that the regular jury lists, as prepared by the County Commissioners at their regular meeting on the first Monday in January, 1930, to-wit: the 6th day of said month, have been destroyed and have not been preserved by the Clerk of the Circuit Court of Madison County nor the County Commissioners of said County as

required by law." In this last proposition, in its nakedness, there is some merit. The law makes every provision for the preservation of the integrity of the jury box, and to insure, as far as is humanly possible, competent, fair and impartial jurors for service in the courts of this State. All checks and balances are provided to insure this.

Section 4444 Compiled General Laws of Florida, provides for the making up of the jury lists by the county commissioners of the several counties of this State, and prescribes the qualifications of those whose names shall be placed on this list. This list has to be verified by the county commissioners. The statute then provides that, "Said lists shall forthwith be delivered to the Clerk of the Circuit Court and by him recorded in the minute book of the board of County Commissioners."

If no lists were preserved there would be no way to check the names drawn from the jury box, and there would be no way of showing that the jury lists and the names were lawfully in the box.

The trial court in entering his ruling and judgment overruling the pleas in abatement recites:

"The Court has examined the record of the board of County Commissioners and funds that at its January, 1930, meeting, the same being a regular meeting time of said board, that the jury list was made up by said board, and that the list appears recorded in the minute book of said board. Four of the commissioners were present at said meeting."

It appears that the Court tried and determined the pleas in abatement without issues in law or in fact being presented. It also appears that in determining these pleas the Court examined and considered record evidence outside of the records of this case.

This Court has held in the cases of Woodward v. State, 33 Fla. 508, 15 Sou. Rep. 252, and in the case of Cotton v.

State, 85 Fla. 197, 95 Sou. Rep. 668, that pleas in abatement raising an issue of fact shall be tried by a jury.

The State argues that the record of the minutes of the board of county commissioners is a public record of which the Court can take judicial notice.

Law and precedent have clearly defined the matters and things of which a court will take, or can take, judicial notice. It doesn't include records required by law to be kept by county officers.

In the case of McNish v. State, 47 Fla. 69, 36 Sou. Rep. 176, this Court held that, "An appellate court, as well as every other court, will take judicial notice of its own records, so far as they appertain to the case before it for consideration, but will not take judicial notice in deciding one case of what may be contained in the record of another and distinct case, unless it is brought to the attention of the court by being made a part of the record of the case under consideration."

It was error for the Court to try and determine the two pleas on evidence outside the record of the case.

The intendment of the two pleas in abatement, one and eight, was that there were no jury lists as made by the board of county commissioners, neither the original list nor a record thereof.

The pleas should have been demurred to on the ground that they did not negative the recording of the lists. The Court, though, accepted the issue in the pleas and tried them without a jury.

The fourth and fifth assignments of error will be considered with the sixth assignment of error as they are incorporated in the motion for a new trial. The sixth assignment of error is that "the Court jointly and severally erred in overruling defendant's motion for a new trial."

The 11th and 12th grounds of the motion for a new trial are the Court erred in overruling defendant's motions to quash the venire and to quash the panel of jurors respectively.

The first ground of both motions are the same and read as follows:

" 'That the venire was not drawn from a due and legally constituted jury box, in that on the 24th day of November, A. D. 1931, upon the jury box being brought into court for the purpose of the Court drawing a venire to serve during the last week of the regular term of court, the Court withdrew all names from the jury box and placed them upon his desk in front of him and after apparently engaging in the separation of the slips of paper that were stuck together stirred the same upon the top of his desk and then apparently replaced them back into the jury box, after which he proceeded to draw a venire and from which said jury box, after all the names had been taken therefrom and replaced as aforesaid, the venire drawn and issued for the next regular or special term of Court and for the trial of this defendant, by reason of which said jury box made up and existing under the provisions and purview of the Statute in such cases made and provided.' "

The order of the Court in overruling this motion recites:

" 'On this ground the Court states that he did remove all the slips from the box in open court and under the direct observation of the Clerk and Sheriff, and everybody else in the court room. This was done for the purpose of separating the slips which were badly stuck together and for the purpose of thoroughly mixing the slips and separating them so that the venire when drawn would come from the county in general and not from any particular locality. All this was done in open court and in full, plain public view of the court officers, attorneys and spectators. The names were

written on large slips of extra heavy paper, and in placing them in the box when the list was made up by the County Commissioners, the slips were stuck together in bunches ranging from three slips to six or seven slips, and it was practically impossible, owing to the smallness of the box, to separate them and thoroughly stir them without removing them as was done, and immediately after they were separated and thoroughly stirred they were placed back in the box by the Judge.' "

Section 4444 and 4453 specifically prescribe the procedure to be followed in making up the lists of names of persons selected to serve as jurors and the method of placing them in the box. After the jury box has been made up as provided in these two sections, there is no law or statute authorizing any one, not even the Court, to withdraw all the names from the box, nor to withdraw any names from the box, except as they are drawn as provided by statute for service as jurors. To sanction this would be to invite the destruction of the integrity of the jury box, and would invite the destroying of the safeguards provided by statute for drawing the names of persons from the jury box for service as jurors in the courts of this State. We have to recognize that court officials, from the judge on the bench down, are human beings. The statutes recognize this. We have no assurance that all court officials at *all* times will be immune from human weaknesses and outside influences. The motions to quash the venire and the panel should have been sustained.

The 38th ground of the motion for a new trial is as follows:

" 'The Court erred in making the following statement, and comments during the progress of the trial in the presence of the jury:

" 'The Court knows the witness now upon the stand, Mr. C. D. Tomlinson, from many years acquaintance, knows him to be a man of high character and honor and integrity; and knows that whatever testimony he gives in response to questions which he understands would be the truth as he understands it and nothing else, but that now, as he has stated that the answer that he gave to the previous question wasn't fully understood by him, the Court thinks it proper and permissible for the State's Attorney now to interrogate him further so that he may give an answer to the State's interrogation as he does understand it, and for that reason the Court thinks it right and proper for the State's Attorney to reask the question. All right.' "

We will recite here from the transcript of the testimony and proceedings leading up to this statement by the Court, and immediately following. C. D. Tomlinson, who had been active vice president of the closed Citizens' Bank of Madison, was on the witness stand and was being questioned as to the solvency of A. Livingston, Jr., at the time the $5,000.00 was placed in the bank.

(From the transcript)

Q. Are you familiar with the assets of A. Livingston, Jr., or were you at that time, about March 13, 1929, before that time and just prior to that?

A. Yes, sir.

Q. Are you familiar with his bank account here which you have already identified as one of the records of the bank?

Q. I will ask you what your opinion is with reference to the solvency or insolvency of A. Livingston, Jr., with reference to the payment of this $5,000.00 note on that date?

(Objections, argument, etc. took place, and the question was again asked).

A. I think on that date it would have been paid.

Q. You thought the note would have been paid?

A. Yes, sir.

Q. That is not the question.

A. Well—

MR. HORNE: May it please the Court, we object to the State's counsel arguing the question, it speaks for itself.

THE COURT: The question is directly to the solvency or insolvency of A. Livingston, Jr., on that day.

Q. Answer the question.

MR. HOWELL: We submit the witness has answered the question, Mr. Tomlinson says why on that date I thought the note would be paid.

THE COURT: I think the answer was responsive.

Q. How did you think it would be paid?

(Objection, objection overruled).

A. Well, at that time that was practically all that Arch owed, and he has stock in two different corporations; one that I know of of my own personal knowlededge that had value. He had his personal effects, and I understood and was reliably informed that he was also a stockholder in another local corporation, and the aggregate of his holdings in those two corporations at that time, if I had been informed correctly about Madison Leaf Tobacco Company stock, he could have taken care of this obligation; besides that, the securities, the boy had some ability to make money, and also he had at that time, his father Mr. A. Livingston, had possibilities of an interest in his estate, which all of us thought valuable at the time. Later developments, however, knocked all that out.

Q. You mean to show that he was insolvent?

A. To show that he was insolvent at that time?

Q. Yes.

A. No, sir, at that time.

MR. HODGES: We object to the later developments.

THE COURT: I think that is correct.

MR. SCOFIELD: Now, the State at this time desires to announce that it is surprised with reference to the evidence of this witness, and desires to interrogate him with reference to a former conversation he had with the State's Attorney.

Q. Didn't you tell me, in a conversation with you yesterday or this morning, that the reason you thought the note would be paid was because Mr. A. Livingston, Jr., said that he would see that it was paid?

MR. HOWELL: We would object to that on the ground—

A. A. Livingston, Sr., I mean?

THE COURT: The objection to that question was?

MR. HODGES: We object on the ground that Mr. Tomlinson is the State's witness, and this question tends to discredit his statement, and the State is not allowed to conduct that kind of an examination.

THE COURT: You are familiar with the rule that when an attorney says he has been surprised by the witness, and so forth?

MR. HODGES: Yes.

THE COURT: When a reputable attorney announces that he is surprised at the testimony of a witness whom he has produced, and the Court cannot look otherwise than with good faith upon an attorney as the Court looks upon all counsel in this case, and the State's Attorney is a sworn officer of the State, and makes the statement, from his standing in those two positions the Court cannot do other than he-

asks to do, that is to interrogate the witness, and in that case the Court thinks he has the right to interrogate the witness.

THE WITNESS: Your Honor, is it permissible for me to talk to the State's Attorney before I answer that question?

. THE COURT: Yes, sir.

MR. HORNE: We have no objections.

. THE COURT: All right.

(The recess was taken and proceedings resumed.)

Q. I will ask you, Mr. Tomlinson, from your knowledge of Mr. A. Livingston, Jr., and from your knowledge of his assets at the time this note was put in the bank, what is your opinion as to his solvency or insolvency with reference to the payment of it, basing your opinion on those things?

MR. HORNE: We object to the question because it is not as complete as required by the law and the allegations of the indictment.

MR. SCOFIELD: I will state in connection with that, your Honor, that the witness has stated that he did not understand.

MR. HORNE: Could I finish my question, Mr. Scofield, please, sir?

. MR. SCOFIELD: Yes, sir.

MR. HORNE: If the Court will allow me just a minute, I will find the allegations in the indictment. (After referring to the instrument.) In that the law would require A. Livingston, Jr., to be totally and wholly insolvent at the time, and it is alleged in the indictment that he was then and there insolvent, which would mean totally insolvent, and it is further alleged in the indictment that said promissory note was wholly worthless, and on the further ground that it is a re-statement of the question heretofore propounded to the witness and answered by him, and which the Court, upon

the insistence of counsel for the defendant held was responsive to the question asked by the State.

MR. HOWELL: May it please the Court, surprise or no surprise, when the State has asked of a witness a specific, clear, plain question, particularly a witness like this, and the witness has given an answer, and then the State insists that that answer is not responsive, and we go back and analyze it, and your Honor found that the answer was responsive, we think the State should not be permitted to ask the same question over again after having a conference with the witness, then coming in here—

MR. SCOFIELD: Just a minute—

MR. HOWELL: Wait until I finish—

MR. SCOFIELD: No, I won't wait.

THE COURT: Wait a minute now—

MR. SCOFIELD: I won't let any statement—

MR. HOWELL: Let me finish—

THE COURT: Wait a minute. When I say wait a minute I mean wait a minute. This is no circus, this is a court, and counsel have got to respect the court. There have been some side remarks made this evening that has stung the Court to the quick.

MR. SCOFIELD: Your Honor, I resent this statement that I took this witness out to talk to him, because the Court knows that this witness asked to talk to me; I haven't asked to talk to him, and it is an insinuation, and I resent it and I demand that he make proof of it at this time and by interrogation of this witness.

THE COURT: Just a moment, gentlemen, I am asking you to cease this argument, and I mean for you to cease it until I give you the floor. Now, Mr. Howell.

MR. HOWELL: Let me say that when your Honor called for silence I naturally concluded that you were addressing

yourself to the State's Attorney. My reason for that was that I had previously risen to address the Court. So far as the State's Attorney is concerned, I want to state in a public way that I did not make any insinuation of any kind; the language I used was that having previously obtained the answer that we think the State is bound by that. Now he asked the question over again with the hope apparently that the question would be different. Now, that is no insinuation against the State's Attorney or the witness, but it is an insistence, if the Court please, that we believe to be the legal rights of this man on trial, and your Honor holds that it was responsive, that the State ought to be bound by it.

THE COURT: Now, Mr. Scofield, have you anything further?

MR. SCOFIELD: I really don't know what the question was.

THE COURT: I understood counsel for the State to say that the witness misunderstood, or didn't fully understand the question; is that correct?

MR. SCOFIELD: Yes, sir.

THE COURT: Is that correct, Mr. Tomlinson?

THE WITNESS: Yes, sir.

THE COURT: The Court knows the witness now upon the stand, Mr. C. D. Tomlinson, from many years' acquaintance, knows him to be a man of high character and honor and integrity, and knows that whatever testimony he gives in response to questions which he understands would be the truth as he understands it and nothing else, but that now, as he has stated that the answer which he gave to the previous question wasn't fully understood by him, the Court thinks it proper and permissible for the State's Attorney now to interrogate him further so that he may give an answer to the

State's interrogation as he does understand it, and for that reason the Court thinks it is right and proper for the State's Attorney to re-ask the question. All right.

The questions and answers of this witness, over the defendant's objections, were as follows:

Q. I wish to ask you, Mr. Tomlinson, from your knowledge of Mr. A. Livingston, Jr., and of his assets at the time the note was put in the bank on March 13th, 1929, what was your opinion as to his solvency or insolvency, his ability to pay this note out of his assets?

A. You mean out of the visible assets at the time the note was taken in the bank?

Q. Yes, sir.

A. Well, so far as my personal knowledge was concerned he did not have enough visible assets at the time to cover the note.

We have recited the proceedings in this particular so that the atmosphere of the court room, and the emphasis placed upon the testimony of this witness on the question of the insolvency of A. Livingston, Jr., might be appreciated. The proposition here sought to be established by the State was the insolvency of A. Livingston, Jr., at the time his note for $5,000.00 was placed in the bank. The State asked the witness, Tomlinson, his opinion of the solvency or insolvency of A. Livingston, Jr., at the time this $5,000.00 note was placed in the bank. The witness answered, "I think on that date it would have been paid." He then gives his reason for so thinking. The State announces that he is surprised at this testimony of the witness, and intimates that the witness had made a different statement to him prior to this time. The proceedings, arguments, etc., were then had as recited. Then the Court, in open court and in the

presence of the jury, made the statement complained of. The Court, by this statement, clearly vouched for the integrity and credibility of the witness, Tomlinson. The effect of this proceeding, and statement by the Court, might reasonably have been to cause the jury to believe that the proposition of the insolvency of A. Livingston, Jr., and the worthlessness of the $5,000.00 note established. This in face of the fact that when the witness was re-asked the question his answer was: "Well, so far as my personal knowledge was concerned he did not have enough visible assets at that time to cover the note."

In 26 Ruling Case Law, 1027, paragraph 28, the general proposition is stated as follows:

"In all trials the Judge should preside with impartiality. In jury trials especially he ought to be cautious and circumspect in his language and conduct before the jury. He should not express or intimate an opinion as to the credibility of the witness, for the jury are the sole judges of the credibility of witnesses."

In the cases of Garner v. State, 28 Fla. 113, 9 So. Rep. 835, 29 Am. St. Rep. 232, and Roberson v. State, 40 Fla. 509, 24 So. Rep. 474, this Court has held:

"Remarks made by the Judge, in the course of a trial, as to the credibility of witnesses or the right of relevant evidence, however inadvertently such remarks may be made, are the subject of exceptions and of assignment as error by the party to whom they may seem to be prejudicial, and are grounds for reversing a judgment. The policy of our jurisprudence is, that the jury shall decide all such questions, entirely liberated from the influence of the impressions of the judge as to them."

The lower court erred in vouching for the honor and integrity of the witness, C. D. Tomlinson.

In the third count of the indictment, upon which the defendant was tried and convicted, there was charged a violation of the provisions of Section 7251, Comp. Gen. Laws of Florida, 1927, which is as follows:

"Every president, cashier, director, teller, clerk or other officer or agent of any banking or trust company or corporation, doing a banking business in the State of Florida, who embezzles, abstracts, or willfully misapplies any of the money, funds or credits of any banking or trust company or corporation * * * shall be deemed guilty of a felony."

. The third count of the indictment alleges that the defendant committed the crime alleged in the County of Madison, State of Florida; that the said defendant "did on the 26th day of February, 1929, issue a certain bank draft, of the said banking corporation, payable to the Atlantic National Bank of Jacksonville, Florida, drawn on the Citizens and Southern National Bank of Atlanta, Georgia, in the sum of $7,000.00," and that the proceeds from the said draft was used by the defendant, on the 27th day of February, 1929, to pay his personal note due by him to the Atlantic National Bank of Jacksonville.

. The testimony in the case shows that, on the 20th day of February, 1929, the defendant was in the City of Jacksonville, Duval County, Florida, that the draft in question was issued by C. D. Tomlinson, active vice-president of the Citizens Bank of Madison, on the 26th of February, 1929, in Madison County, Florida, and was transmitted to the Atlantic National Bank of Jacksonville.

The 119th ground of defendant's motion for a new trial is: "The Court erred in giving his sixteenth charge to the jury."

The Court's sixteenth charge to the jury is as follows: "The Court further charges you that if you find from

the evidence that the defendant placed the note referred to in the indictment, in the bank in Madison County, Florida, for the purpose and in the manner and form and with the intent to injure and defraud said bank, as charged in the in-•dictment, and that such acts and doings took place in Madison County, Florida, then the Court charges you that the offense charged would be within the jurisdiction of this Court, as under such circumstances, as a matter of law, the Court charges you the offense would have been committed in Madison County, Florida."

The placing of the note of A. Livingston, Jr., for $5,-000.00 in the bank on the 13th day of March, 1929, did not constitute the misapplication. The placing of the note for $5,000.00 in the bank was an undertaking to cover the offense already committed. The sixteenth charge of the Court was therefore erroneous.

The 104th ground of defendant's motion for a new trial is: "The Court erred in overruling the motion of the defendant for a directed verdict as to the third count of the indictment at the close of all the testimony of the State and the defendant."

The substance of this motion for a directed verdict was that the State had failed to prove that the crime alleged had been committed in Madison County, Florida, and in the manner and form as alleged.

The willful misapplication made an offense by this statute means, a misapplication for the use, benefit, or gain of the party charged, or of some company or person other than the bank. Therefore, to constitute the offense of willful misapplication, there must be a conversion by the defendant to his own use or to the use of someone else, of the moneys and funds of the bank by the party charged. United States v. Britton, 107 U. S. 655, 2 Sup. Ct. Rep. 512, 27 L. Ed. 520;

United States v. Northway, 120 U. S. 327, 7 Sup. Ct. Rep. 580, 30 L. Ed. 664; Evans v. United States, 153 U. S. 584, 14 Sup. Ct. Rep. 934, 939, 38 L. Ed. 830; Coffin v. United States, 156 U. S. 432, 15 Sup. Ct. Rep. 394, 39 L. Ed. 481.

In the case of McKinnie v. State, 44 Fla. 143, 32 So. Rep. 786, this Court held: "It is necessary for an indictment to state the county within which the offense was committed, and the proof must affirmatively sustain such allegation."

Undoubtedly the misapplication of the funds constitutes the offense, and the county in which this is done is the county in which the crime is committed. People v. Meseros, 16 Cal. App. 277, 116 Pac. 679; State v. Mispagel, 108 Mo. 673, 106 S. W. 513.

A majority of the Court are of the opinion that where the president and director of a bank by virtue of the power of control, direction and management over the money, funds, credits, business and affairs of the bank which he has and exercises as president and director secures a withdrawal of funds of the bank for the purpose of misapplying them to his own use and benefit, that the offense of misapplication is to be deemed to have *begun* at the time and place the withdrawal of the bank's funds or assets has been committed for the purpose of having the same misapplied to the personal use of the president and director causing them to be withdrawn, although such offense may not be fully completed until a conversion has actually taken place in some other county.

Section 7121, C. G. L., 5019 R. G. S., provides as follows: "In all cases where an indictable offense shall be perpetrated in this State and the same shall commence in any one county and terminate in another, the offender shall be liable to indictment in either county."

A majority of the Court are further of the opinion that this statute is applicable to a case like the one at bar where the indictment charges and the proof shows a withdrawal of funds of the banking institution in one county for the purpose of converting the same in another county where the withdrawal has been followed up by an actual completion of the misapplication through acts which began in the county in which the bank was located but which were fully accomplished only through acts consummated elsewhere.

A motion for a directed verdict was therefore properly denied.

For the errors pointed out in the foregoing opinion, the judgment is reversed and the cause remanded with directions to grant a new trial and have such other proceedings as may be according to law.

Reversed for a new trial.

DAVIS, C. J., and WHITFIELD, BROWN and BUFORD, J. J., concur.