# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58855-2-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| CATALINA MARIE GUILLEN, | |
| Appellant. | |

CHE, J. — Catalina Marie Guillen appeals a jury trial conviction for 10 counts of identity theft in the second degree and one count of forgery. Guillen also appeals a guilty plea for one count of theft in the third degree and one count of failure to appear.

Guillen stole a sweatshirt from a store. Law enforcement officers later found counterfeit $100 bills in her possession and, in the car Guillen had been a passenger, a notebook containing financial information of several individuals. Prior to trial, Guillen pleaded guilty to one count each of theft in the third degree and failure to appear. Guillen proceeded to trial on the second degree identity theft and forgery charges.

Guillen argues that (1) her pleas of guilty to third degree theft and failure to appear were involuntary, (2) the prosecutor committed reversible misconduct by relying on gender bias and/or misstating the presumption of innocence and burden of proof during jury selection, opening arguments, and closing arguments, (3) the prosecutor violated her right to be free from

gender discrimination under Washington's Equal Rights Amendment (ERA), and (4) she was denied effective assistance of counsel when defense counsel improperly stated the burden of proof during voir dire and failed to object to the prosecutor's allegedly improper statements.

We accept the State's concession that Guillen's guilty plea for failure to appear was involuntary and, thus, warrants reversal. For Guillen's remaining claims, we hold that Guillen fails to establish that (1) her guilty plea for third degree theft was involuntary, (2) the prosecutor committed reversible misconduct, (3) the prosecutor violated her rights under the ERA, or (4) Guillen's counsel rendered ineffective assistance of counsel.

Accordingly, we affirm Guillen's convictions for identity theft in the second degree, forgery, and third degree theft, but reverse Guillen's conviction for failure to appear and remand for further proceedings.

FACTS

BACKGROUND

Sergeant Patty Finch and Officer Daniel Cox were dispatched to a store at a mall "for a suspicious circumstance" involving a certain car. Rep. of Proc. (RP) at 108. When Officer Cox arrived at the mall, he found the car with no person but two dogs in it.[1] Officer Cox entered the store and contacted the reporting party. The individual pointed out Guillen and a man, who appeared to be together. Officer Cox observed Guillen and the man leave the store, with Guillen heading toward the car and the man walking in the opposite direction of the car.

---

[1] The dogs were later determined to be Guillen's.

Once outside the store, Guillen was contacted by Officer Cox and Sergeant Finch, who arrived later.  Guillen had a brown purse and a black laundry bag, which had a sweatshirt in it.  Attached to the sweatshirt was a security sensor and a price tag reflecting a price of about $181.  Guillen initially said that the sweatshirt was hers, but then admitted to stealing it despite stating that she had money to pay for it.  After the officers confirmed that the sweatshirt was stolen from the store, the officers placed Guillen under arrest.

Guillen explained that she left the store with a man named Alonzo, who had picked up her and her dogs and driven them to the mall in order for Alonzo and Guillen to go shopping.  Other than Alonzo's first name, Guillen did not know anything else about him, and the officers were unable to find the man after arresting Guillen.

The search incident to arrest revealed $82 dollars and in Guillen's purse three $100 bills, which the officers immediately identified as counterfeit based on off-centered printing, feel, and the same serial number on each $100 bill.  According to Guillen, she received the money from someone who she and Alonzo had met with when selling some of Guillen's belongings.  Guillen had not noticed anything unusual about the bills and did not realize they were fake.

When Officer Andrew Huerta searched the car pursuant to a search warrant, he discovered a notebook containing "various usernames, passwords, email accounts, social security numbers, debit card numbers, names of subjects," and checks.  RP at 144; *see also* Ex. 19-56.  The notebook contained "means of identification and/or financial information" of 10 individuals who "did not give their permission for any of their information to be included in the notebook."  RP at 161-62.  Some of the 10 individuals owned accounts associated with blank or partially filled out checks within the notebook.  The notebook pages also contained a letter regarding the

possible continuation of an apparent romantic relationship written to a person named "Brian," who at times was referred to as "Sandy" and "Sandyballs."[2]  Suppl. Clerk's Papers (CP), Ex. 53, at [144] (PDF at 67).  Officer Huerta observed that the writing in the notebook, including the letter, primarily appeared to be from the same person.

Officer Huerta found the notebook on the front passenger side of the vehicle.  Guillen denied seeing the notebook or its contents despite sitting in the front passenger seat when Alonzo drove them to the mall.  Guillen also denied any involvement in writing down the notebook's information even though the letter in the notebook matched the first name of her ex-boyfriend, Bryan Sandoval.[3]

PROCEDURAL HISTORY

The State charged Guillen with three counts of second degree identity theft, forgery, and third degree theft.  For the third degree theft charge, the information provided that Guillen "with intent to deprive another of property, to-wit: a sweatshirt, did wrongfully obtain such property belonging to [store]."  CP at 3.

On June 1, 2023, the trial court arraigned Guillen and set a court date for June 15.  There is no document in the appeal record that shows Guillen received written notice to appear at the June 15 court date.  On June 15, Guillen failed to appear in court.  In July 2023, the State filed an amended information adding seven more counts of second degree identity theft and one count of

---

[2] In closing, the State argued the references to "Sandy" and "Sandyballs" was a "[p]et name" for Sandoval, Guillen's ex-boyfriend's last name.  RP at 238.

[3] The RPs reflect Guillen's ex-boyfriend's first name as "Bryan" instead of "Brian," as found in the notebook, but the RPs do not reflect the court reporter obtaining the proper spelling for the name.

failure to appear.[4]  The amended information provided, for the failure to appear charge, that Guillen, "being held for, charged with, or convicted of a crime that is classified as a felony, and having been released by court order or admitted to bail, has received written notice of the requirement of a subsequent personal appearance before . . . the Lewis County Superior Court [in cause number] did fail to appear as required and [] [w]ithin thirty days of the issuance of a warrant for failure to appear or surrender, does not make a motion with the court to quash the warrant."  CP at 121.

At a hearing on July 20, the court clerk's minute entries reflect "Cond[itions] of release addressed 75,000 cash or surety," and "Cont[inued] to 7/27/23 Arraign[ment] on amended info[rmation]."  CP at 123.  In October 2023, the State filed a third amended information adding an aggravator for multiple current offenses to the 10 counts of second degree identity theft.

Prior to trial, Guillen pleaded guilty to third degree theft and failure to appear.  In the single plea form, Guillen stated that she was informed of and understood that she was being charged with theft in the third degree and that the charge included the elements of "wrongfully obtain[ing] property of another."  CP at 15.  Guillen also stated that she was informed of and understood that the charge of failure to appear included the elements of "[a]fter having been charged with a felony and released by court order with a date certain to return to court, knowingly failed to appear and within 30 days failed to motion the court to clear the warrant."  CP at 15.  Guillen admitted to committing theft in the third degree and failure to appear per the third amended information and stated that she made such plea "freely and voluntarily."  CP at

_____

[4] There appears to be a second amended information dated August 24, but that is not contained in our appeal record.  Further, there is no transcribed record or court notes of the July 6 or August 24 court proceedings.  The record contains the third amended information.

25-26. In stating what she did that made her guilty of the crimes, Guillen wrote, "On 5-19-2023 in Lewis County, WA, I stole property from the [] store and after being charged with a felony and released by court and ordered to appear [] I knowingly failed to appear and had not made arrangements to clear the warrant within 30 days." CP at 26.

At the plea hearing, the trial court confirmed with Guillen that her attorney had read her the guilty plea form, she and her attorney had reviewed the elements required for the charges, she did not have any questions regarding any element or what it meant to commit the offenses, and believed she fully understood the plea form's content and consequences. The trial court additionally confirmed with Guillen that her statement regarding the actions underlying her guilty plea was accurate. The trial court then found that Guillen's pleas were knowingly, intelligently, and voluntarily made "with a full understanding of the nature of the offense[] and the consequences to pleading guilty." RP at 31.

At trial, witnesses testified consistently with the facts outlined above and the trial court admitted three items into evidence: the $100 bills, the notebook, and photo copies of the notebook's pages.

During voir dire, the State's prosecutor had the following unobjected-to exchange with a prospective juror:

> [PROSECUTOR] Well, let me ask you this. Have you ever heard of "presumption of innocence"?
>
> [POTENTIAL JUROR] No.
>
> [PROSECUTOR] So you might have – you might not know exactly what I'm talking about, but have you ever heard the saying that a person is innocent until proven guilty?
>
> [POTENTIAL JUROR] I do know that, yes.

[PROSECUTOR] So that's what I mean by the "presumption of innocence." Everybody, even -- everyone is presumed innocent until I as the State prove beyond a reasonable doubt that the person was guilty. So as it sits now, [] Guillen is completely innocent of these charges.

RP at 70.

Later on, Guillen's counsel had the following conversation with another prospective juror:

[DEFENSE COUNSEL] So [the prosecutor] mentioned the idea of "innocent until proven guilty" as a criminal law foundation for us. Does anybody disagree with that, think it should be the reverse?

. . . .

[POTENTIAL JUROR] Most of the times when you're arrested, you're guilty until proven innocent. You're going to come in here and present your half and hope to beat the sentence.

[DEFENSE COUNSEL] So you don't agree --

[POTENTIAL JUROR] No.

[DEFENSE COUNSEL] -- that it works that way?

[POTENTIAL JUROR] No.

[DEFENSE COUNSEL] Okay. Do you disagree with the foundation that somebody should be innocent until proven guilty?

[POTENTIAL JUROR] No; I believe you should be innocent until proven guilty.

RP at 81-82.

During the opening statements, when the prosecutor mentioned the notebook he stated:

Of note is a notebook, also, that Officer Huerta finds on the passenger side floorboard of the vehicle. You'll get to see pictures of the contents of this notebook. I hope nobody's offended by this, but it's apparent that it's written by a female's hand. The handwriting is consistent throughout the entirety of the notebook.

No. 58855-2-II

RP at 101. Guillen did not object to this statement.

When both sides had rested, the trial court provided instruction to the jury which included

the following:

> You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. In assessing credibility, you must avoid bias, conscious or unconscious, including bias based on religion, ethnicity, race, sexual orientation, *gender* or disability.
>
> . . . .
>
> It is important [] for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits.

CP at 30 (emphasis added).

> The defendant has entered a plea of not guilty. That plea puts in issue every element of each crime charged. The State . . . has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements.
>
> A defendant is presumed innocent. This presumption continues throughout the entire trial *unless* during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.

CP at 32 (emphasis added). No party requested a missing witness instruction and the trial court

did not include such a jury instruction.

During closing argument, the State argued, "The defendant told you that she's from the

Seattle area and a person by the name of Alonzo drove her down to the [] mall[]." RP at 214.

Shortly thereafter, the State continued with, "[Guillen] also never testified about anyone else

being associated with the vehicle, just her and Alonzo." RP at 214-15.

While discussing the elements of the charged crimes, the prosecutor stated:

> Financial information and means of identification are contained in the notebook. There's nothing to say that the four sets of four digits were anything else

8

than credit card numbers. There's nothing to say that the dates associated with those four sets of digits was the expiration date. Nothing saying that the three numbers -- contradicting that the three numbers were the security code. . . . All of that information is there. There's really no contesting that that's what that information was.

And as far as the [forgery], there's no contesting that [] Guillen actually possessed the counterfeit money.

RP at 217.

Toward the end of the State's argument, the State addressed how "[Guillen's] explanation for how she obtained the money is a little suspicious." RP at 227. He stated:

So [] Guillen told you that she acquired the three 100-dollar bills after selling some property on [an online sale platform]. Again, it's this Alonzo person who was there to witness this transaction, and [] Guillen says that she received that money from somebody during that transaction. And that's all that you have to establish her story, is that version of events.

RP at 227.

During rebuttal, the State described the notebook, as well as the question of whether Guillen knew of the notebook's existence as "the crux of the case." RP at 237. The prosecutor argued that the handwriting in the notebook was the same as that of a letter addressed to "Brian" who shared the same name as Guillen's admitted ex-boyfriend. RP at 237-38. Guillen did not object to any of these statements by the prosecutor in closing.

Sometime during the prosecutor's closing arguments, the prosecutor also showed the jury a visual presentation that included a slide titled "Common / Not in Dispute" and stated "[s]ome elements are not in dispute . . . [f]inancial information / means of identification [and] [p]ossessed

counterfeit money."[5]  Suppl. CP at 93.  The prosecutor also stated multiple times that it was the State's burden to prove each element beyond a reasonable doubt.

The jury returned a verdict of guilty on 10 counts of identity theft in the second degree and one count of forgery.  The trial court sentenced Guillen to 43 months of total confinement and 12 months of community custody.

Guillen appeals.

## ANALYSIS

Guillen argues that (1) her pleas of guilty to third degree theft and failure to appear were involuntary, (2) the prosecutor committed reversible misconduct by relying on gender bias and/or misstating the presumption of innocence and burden of proof during jury selection, opening arguments, and closing arguments, (3) the prosecutor violated her right to be free from gender discrimination under the ERA, and (4) Guillen was denied effective assistance of counsel when defense counsel improperly stated the burden of proof in voir dire, thereby improperly suggesting that the State met its burden of proof, and failed to object to the prosecutor's allegedly improper statements.

### I.  INVOLUNTARY PLEA

Guillen argues that both her convictions for third degree theft and failure to appear should be set aside because her guilty pleas were not constitutionally valid as she did not understand the law in relation to the facts.

---

[5] There is no evidence in the record that Guillen objected to the presentation or the presentation's contents.

When a defendant challenges the constitutionality of a guilty plea, even post-judgment, we review such claims de novo. *State v. Buckman*, 190 Wn.2d 51, 57, 509 P.3d 193 (2018).

Because a defendant waives crucial constitutional rights when entering a guilty plea, a defendant's plea must be made knowingly, intelligently, and voluntarily to be valid. *State v. Branch*, 129 Wn.2d 635, 642, 919 P.2d 1228 (1996); *see also State v. Codiga*, 162 Wn.2d 912, 922, 175 P.3d 1082 (2008) ("Due process requires that a defendant's guilty plea must be knowing, intelligent, and voluntary."). We determine whether a plea is knowingly, intelligently, and voluntarily made based on the totality of circumstances. *State v. Snider*, 199 Wn.2d 435, 444, 508 P.3d 1014 (2022). These requirements must be shown affirmatively, and the State bears the burden of proving a guilty plea is valid. *State v. Ross*, 129 Wn.2d 279, 284, 287, 916 P.2d 405 (1996).

"A guilty plea 'cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts.'" *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 271, 172 P.3d 335 (2007) (quoting *McCarthy v. United States*, 394 U.S. 459, 466, 89 S. Ct. 1166 (1969)). A defendant does not make a plea intelligently "unless [the] defendant first receives 'real notice of the true nature of the charge against him.'" *Snider*, 199 Wn.2d at 444 (quoting *Bousley v. United States*, 523 U.S. 614, 618, 118 S. Ct. 1604 (1998)). At a minimum, the State must show that the defendant was aware of the specific acts and state of mind required by the charged offense, i.e., the elements of the crime. *See Snider*, 199 Wn.2d at 444.

A valid guilty plea does not require a defendant to admit every element of the charged crime, but instead the defendant must understand the critical elements of the crime and admit to conduct which satisfies those elements. *In re Pers. Restraint of Hews*, 108 Wn.2d 579, 596, 741

11

P.2d 983 (1987). When a defendant signs a plea agreement, "strong evidence" arises that a plea is voluntary. *State v. Pugh*, 153 Wn. App. 569, 577, 222 P.3d 821 (2009); *see also Branch*, 129 Wn.2d at 642. Additionally, when the trial court then inquires into the voluntariness of the plea on the record and the defendant admits to reading, understanding, and signing the plea agreement, there is a strong presumption that the plea was made voluntarily. *Pugh*, 153 Wn. App. at 577; *State v. Smith*, 134 Wn.2d 849, 852, 953 P.2d 810 (1998).[6] Further, when relevant documents, including the information, accurately describe the crime's elements, we presume the plea is valid, "subject to a showing that the defendant was affirmatively misled." *Snider*, 199 Wn.2d at 445.

A. *Third Degree Theft*

Guillen argues specifically that she did not understand the intent requirement in third degree theft and that she never admitted to acting with the requisite intent to deprive. We disagree.

A defendant commits theft in the third degree, among other ways, when they wrongfully obtain or exert unauthorized control over the property or services of another, with the intent to deprive [the owner] of such property or services, and the property's value does not exceed $750. RCW 9A.56.050(1)(a); RCW 9A.56.020(1)(a).

Here, Guillen signed a guilty plea, agreeing that she was informed of and understood that she was being charged with third degree theft and that the charge included the element of "wrongfully obtain[ing] property of another." CP at 15. Guillen admitted to committing third

---

[6] *See also State v. Perez*, 33 Wn. App. 258, 262, 654 P.2d 708 (1982) ("When the judge goes on to inquire orally of the defendant and satisfies himself on the record of the existence of the various criteria of voluntariness, the presumption of voluntariness is well nigh irrefutable.").

degree theft per the third amended information and stated that she made such plea "freely and voluntarily." CP at 25. The original, amended, as well as the third amended information included "intent to deprive another of property" as an element of the charged crime and specifically provided that Guillen "wrongfully obtain[ed] [a sweatshirt] belonging to [store name]." CP at 3.

Additionally, in Guillen's statement of what made her guilty of the crime, Guillen admitted that she "stole property from the [] store." CP at 26. "Stole" is the past participle of "steal," which is analogous to the "felonious taking and removing of personal property *with intent to deprive* the rightful owner of it." WEBSTER'S THIRD NEW INT'L DICTIONARY 2232, 2248, 2369 (2002). Thus, implicit in her statement is the intent to deprive.

Further, at a hearing regarding the plea, the trial court confirmed with Guillen that she and her attorney had reviewed the required elements for third degree theft, she did not have any questions regarding any element or what it meant to commit the offense, and she fully understood the plea agreement's content and consequences. The trial court additionally confirmed with Guillen that her statement regarding the actions underlying her guilty plea was accurate. Based on Guillen's statements, the trial court found that Guillen's guilty plea was knowingly, intelligently, and voluntarily made "with a full understanding of the nature of the offense[] and the consequences to pleading guilty." RP at 31.

The totality of the circumstances shows that Guillen pleaded guilty to third degree theft, understanding that the "intent to deprive another of property" was an element of the crime and that her guilty plea admitted conduct meeting such element. The record supports a strong presumption that Guillen pleaded voluntarily: the charging documents accurately described each

13

element of third degree theft, Guillen signed the plea, and the trial court confirmed with Guillen that she was advised of the crime's elements, did not have questions regarding the necessary elements or conduct, and fully understood the plea. *Pugh*, 153 Wn. App. at 577; *Smith*, 134 Wn.2d at 852; *Snider*, 199 Wn.2d at 445. Guillen points to no facts that overcome this presumption or demonstrate that she was affirmatively misled. *See Snider*, 199 Wn.2d at 449. Considering the totality of the circumstances and the strong presumption that the plea was voluntarily made, we hold that Guillen fails to show that her guilty plea for third degree theft was made involuntarily.

## B. *Failure to Appear*

Guillen contends the plea form did not include the required written notice element for the crime of failure to appear. The State agrees that Guillen's guilty plea lacked the requirement of written notice and Guillen's factual statement did not contain an acknowledgement that she received written notice. Thus, the State concedes that Guillen's conviction for that crime should be set aside. We accept the State's concession.

For the crime of failure to appear, receiving written notice of the requirement to appear before the court is an element of the crime. *See* RCW 9A.76.190(1)(a). The State has the burden of establishing that Guillen's guilty plea to failure to appear was made knowingly, intelligently, and voluntarily. *Ross*, 129 Wn.2d 279, 284. While a strong presumption of validity arises from nearly the same facts as discussed above, this presumption is overcome by the parties' assertion that Guillen's plea should be set aside because the plea form did not mention the written notice requirement as an element of the crime nor did Guillen's factual statement acknowledge she received written notice of the requirement to appear. *See* CP at 15 (describing the elements of

failure to appear as "[a]fter having been charged with a felony and released by court order with a date certain to return to court, knowingly failed to appear and within 30 days failed to motion the court to clear the warrant."); *see also* CP at 26 (Guillen's statement of what she did to be guilty of the crime omitting any mention of written notice). Because the State bears the burden of establishing that Guillen's plea was made knowingly, voluntarily, and intelligently, we accept the State's concession and reverse Guillen's conviction for failure to appear. *Ross*, 129 Wn.2d 279, 284.

## II. PROSECUTORIAL MISCONDUCT

Guillen argues, for the first time on appeal, that reversible prosecutorial misconduct occurred during voir dire, the State's opening statement, and the State's closing arguments. First, Guillen contends that the prosecutor impermissibly told prospective jurors in voir dire that "defendants are considered innocent 'until' proven guilty." Br. of Appellant at 16. Second, Guillen argues that the prosecutor relied on gender bias through their statement made in opening. Third, Guillen argues that the prosecutor impermissibly shifted the burden of proof in closing arguments. Additionally, Guillen argues that the combined effect of these instances of prosecutorial misconduct prejudiced her case. We disagree.

A.  *Legal Principles*

To prevail on a claim of prosecutorial misconduct, the defendant bears the burden of showing that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). For prosecutorial misconduct claims related to a prosecutor's comments, we review the challenged statements "in the context of the whole argument, the issues of the case, the evidence addressed in argument, and the instructions given

to the jury." *State v. Scherf*, 192 Wn.2d 350, 394, 429 P.3d 776 (2018); *see also State v. Gouley*, 19 Wn. App. 2d 185, 200, 494 P.3d 458 (2021).

To determine whether reversal is required due to prosecutorial misconduct, we employ one of two tests depending on whether the defendant objected below. *Gouley*, 19 Wn. App. 2d at 200. If the defendant objected to the prosecutor's remarks, the defendant must show that (1) the remarks were improper, and (2) there is a substantial likelihood the misconduct affected the verdict. *Id.* If the defendant did not object below—as occurred here—the prosecutorial misconduct claim is waived unless the defendant can show "(1) that comments were improper, (2) that the prosecutor's comments were both flagrant and ill-intentioned, (3) that the effect of the improper comments could not have been obviated by a curative instruction, and (4) that a substantial likelihood the misconduct affected the verdict." *Id.* at 201.

In evaluating whether the defendant has overcome waiver when they did not object below, we "'focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.'" *Id.* (quoting *Emery*, 174 Wn.2d at 762, n.14). If the defendant fails to show that any improper remarks were incurable, their claim "'necessarily fails, and our analysis need go no further.'" *Id.* (quoting *Emery*, 174 Wn.2d at 764).

B.      *The Prosecutor Did Not Misstate the Presumption of Innocence and Burden of Proof During Voir Dire*

First, Guillen argues that the prosecutor committed misconduct during voir dire by telling prospective jurors that defendants are considered innocent "until" proven guilty, which Guillen

argues implies that Guillen's conviction was inevitable and conflicted with the trial court's instructions. Br. of Appellant at 16. We disagree.

Certainly, two bedrock principles of our criminal legal system are a defendant's presumption of innocence and the State's burden to prove every element of the charged crime beyond a reasonable doubt. *State v. Chacon*, 192 Wn.2d 545, 548-49, 431 P.3d 477 (2018).

During voir dire, the State referred to the presumption of innocence as "a person is innocent until proven guilty." RP at 70. The jury instructions described the presumption of innocence as one that "continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt." CP at 32.

It is not apparent how the prosecutor's use of the term "until" undermined the presumption of innocence or misstated the presumption. In context, the prosecutor's use of the term "until" suggested that Guillen's presumption of innocence continued up to a moment, if it ever occurred, when the State met its burden of proof.[7] *See* RP at 70.

Additionally, Washington case law does not proscribe the use of "until," even in a trial court's instructions to a jury. *See State v. Williams*, 49 Wn.2d 354, 361, 301 P.2d 769 (1956) (declining to hold that the phrase 'until proven guilty' as included in jury instructions is erroneous when defendant argued that the instruction presupposes that a jury will find him guilty).

Guillen relies on *Coffin v. United States*, 156 U.S. 432, 15 S. Ct. 394, 39 L. Ed. 481 (1895), to contend that the constitution mandates the presumption of innocence to state that the

---

[7] As commonly used, "until" refers to the continuance of a condition up to a particular time. WEBSTER'S THIRD NEW INT'L DICTIONARY 2513 (2002).

defendant is innocent "unless" proven to be guilty and, thus, that the prosecutor's use of "until" amounts to misconduct. Br. of Appellant at 16. However, Guillen mischaracterizes *Coffin*'s holding.

In *Coffin*, a trial court refused to instruct the jury as to the presumption of innocence at all. 156 U.S. at 453. And so the United States Supreme Court considered the question of whether the instruction the court used—that there cannot be a conviction unless the proof shows guilt beyond a reasonable doubt—"embodie[d] the statement of presumption of innocence as to justify" the court's refusal to explicitly instruct on the presumption. 156 U.S. at 457. This inquiry prompted the Court to discuss the difference between the presumption of innocence and reasonable doubt principles. In doing so, the court provided the language which Guillen relies on: "the presumption of innocence is a conclusion drawn by the law in favor of the citizen, by virtue whereof, when brought to trial upon a criminal charge, he must be acquitted, *unless* he is proven to be guilty." 156 U.S. at 458-59 (emphasis added). However, the Court immediately after stated, "In other words, this presumption is an instrument of proof . . . whereby [an accused's] innocence is established *until* sufficient evidence is introduced to overcome the proof." 156 U.S. at 459 (emphasis added).

Contrary to Guillen's contention, *Coffin* does not prohibit the use of the term "until" when describing a defendant's presumption of innocence. Instead, *Coffin* even used the term "until" when providing an additional construction of the presumption of innocence. And an examination of our State's case law reveals a statehood-long history of including "innocent until proven guilty" as a commonly understood meaning of the presumption of innocence. *See, e.g., State v. Brooks*, 4 Wash. 328, 333, 30 Pac. 147 (1892); *State v. Odom*, 83 Wn.2d 541, 545-46,

520 P.2d 152 (1974); *State v. Cox*, 94 Wn.2d 170, 174, 615 P.2d 465 (1980); *State v. Pierce*, 134 Wn. App. 763, 772, 142 P.3d 610 (2006); *see also State v. Chacon*, 192 Wn.2d at 553. Even our legislature's expression of the presumption of innocence includes the term "until." *See* RCW 10.58.020 ("Every person charged with the commission of a crime shall be presumed innocent until the contrary is proved by competent evidence beyond a reasonable doubt.").

Because Guillen cites no other authorities holding the term "until" is an improper expression of a defendant's presumption of innocence, we hold that Guillen fails to show that the prosecutor misstated the law or conflicted with the trial court's instructions.

B.      *Guillen Fails to Show the Prosecutor's Statement in Opening Was Improper*

Next, Guillen argues that the prosecutor committed misconduct by relying on gender bias during the State's opening statement. While the State's conduct is ill-advised, Guillen fails to show that the prosecutor's single statement in opening amounted to misconduct.

During the State's opening statement, a prosecutor may present "an outline of the anticipated material evidence[] and [any] reasonable inferences to be drawn therefrom" so long as counsel has a good faith belief that such evidence would be presented at trial. *State v. Campbell*, 103 Wn.2d 1, 15-16, 691 P.2d 929 (1984); *Washington v. Farnsworth*, 185 Wn.2d 768, 785-86, 374 P.3d 1152 (2016). The defendant bears the burden of showing that the prosecutor acted in bad faith. *Campbell*, 103 Wn.2d at 16; *Farnsworth*, 185 Wn.2d at 785.

When addressing the jury during opening statements, the prosecutor mentioned the notebook—evidence the prosecutor later described as "the crux" of the State's case—in the following way:

> Of note is a notebook, also, that Officer Huerta finds on the passenger side floorboard of the vehicle. You'll get to see pictures of the contents of this notebook.

I hope nobody's offended by this, but it's apparent that it's written by a female's hand.

RP at 101, 237. During trial, the trial court admitted the notebook into evidence and the State presented testimony from Officer Huerta that the writing in the notebook, including a letter addressed to someone with the same name as Guillen's ex-boyfriend, primarily appeared to be from the same person.

Guillen asserts that the prosecutor's statements were improper because the prosecutor relied on gender bias; however, Guillen presents no argument explaining how the prosecutor's statements, while certainly ill-advised, were made in bad faith. Given the fact that such a statement was only made once, the notebook was eventually admitted as evidence, the jury could compare the handwriting in the notebook and the letter for itself, and the notebook's contents—including the handwriting—were testified to by witnesses, and because Guillen does not meet her burden of showing bad faith on the prosecutor's part, Guillen fails to show that the inappropriate statements nevertheless amounted to misconduct. *See Campbell*, 103 Wn.2d at 16.

C.      *Guillen Fails to Show That the Prosecutor Committed Misconduct in Closing Argument*

Guillen argues that the prosecutor impermissibly shifted the burden to Guillen in closing arguments by (1) suggesting that Guillen had some burden to prove that the notebook contained "a means of identification or financial information," (2) presenting to the jury a visual slide which stated "[s]ome elements are not in dispute" and underneath it listed "[p]ossessed counterfeit money," and (3) "suggest[ing] that [] Guillen should have called 'Alonzo' to testify." Br. of Appellant at 20, 21, 18. We disagree.

In a criminal case, the State bears the burden of proving every element of the crime beyond a reasonable doubt. *State v. Restvedt*, 26 Wn. App. 2d 102, 127, 527 P.3d 171 (2023).

Thus, it is improper for a prosecutor to comment on a defendant's lack of evidence and infer that the defendant has a duty to present evidence. *State v. Sundberg*, 185 Wn.2d 147, 153, 370 P.3d 1 (2016). However, a prosecutor has "wide latitude to argue reasonable inferences from the evidence" so long as they do not shift the burden of proof onto the defendant. *State v. Thorgerson*, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). Additionally, we have long held that when a defendant decides to testify on their own behalf, a prosecutor may treat them in the same way as any other witness for the purposes of challenging their credibility. *State v. Graham*, 59 Wn. App. 418, 427, 798 P.2d 314 (1990); *State v. Etheridge*, 74 Wn.2d 102, 113, 443 P.2d 536 (1968).

A defendant commits second degree identity theft if the State proves that the defendant knowingly possessed a means of identification or financial information of another person with the intent to commit, aid, or abet a crime and neither obtains value in excess of $1,500 or knowingly targets a senior or vulnerable individual. *State v. Christian*, 200 Wn. App. 861, 864, 403 P.3d 925 (2017); RCW 9.35.020. "Financial information" includes account numbers, codes, passwords, social security numbers, and "other information held for the purpose of account access or transaction initiation." RCW 9.35.005(1). A " 'means of identification' means information or an item that is not describing finances or credit but is personal to or identifiable with an individual or other person," including a social security number or a person's name. RCW 9.35.005(3).

A defendant commits forgery when they possess a written instrument which they know to be forged and do so with the intent to injure or defraud. RCW 9A.60.020. A forged written

instrument includes any paper or document that either falsely made, completed, or altered. RCW 9A.60.010(6), (7).

       i. *No Contrary Evidence or Not in Dispute*

Guillen argues that in closing argument, the State relieved itself of its burden to prove that Guillen possessed a means of identification or financial information, a required element under the identity theft statute, when it argued to the jury "[t]here's nothing to say that" the sequences of numbers and letters listed in the notebook reflected anything but credit card numbers, expiration dates, security codes, social security numbers, addresses, and phone numbers. Br. of Appellant at 20. And by doing so, the State suggested that Guillen had some burden to prove that the information in the notebook did not amount to identification or financial information. Guillen also argues that the prosecutor committed misconduct when they argued that for the forgery charge, possessing counterfeit money was not in dispute. We disagree.

With regard to the prosecutor's statement about the notebook's contents, Guillen asserts that the State "did not present testimony showing that the[] numbers and dates amounted to 'a means of identification or financial information' "and, therefore, improperly argued that the "digits," "dates," and "numbers" met an element for the identity theft charges. Br. of Appellant at 20. But the record does not support Guillen's assertion. Officer Huerta, who found the notebook, testified that the notebook contained the names, usernames, passwords, email accounts, social security numbers, debit card numbers, and checks of people who had not given their permission for such information to be present there. The parties stipulated that 10 named individuals each were "a real person and their means of identification and/or financial information was contained within the notebook . . . [and] they did not give their permission for

any of their information to be included in the notebook." CP at 5. Additionally, the notebook, and the blank and filled-out checks, were admitted into evidence.

Also, in viewing the prosecutor's statement in the context of its entire closing argument, the prosecutor did not impermissibly shift the burden onto Guillen. The prosecutor argued that the notebook contained "[f]inancial information and means of identification," stated his "there's nothing to say that" arguments, then ended the argument with "[t]here's really no contesting that that's what that information was." RP at 217. Ultimately, the prosecutor argued that the none of the financial and identification evidence consisted of contrary evidence. The prosecutor did not argue that Guillen should have or had the burden to present any contrary evidence. Thus, the prosecutor's argument did not shift any burden onto Guillen to produce any evidence.

Even if the State's argument was improper, considering the trial court instructed the jury on the State's burden of proof and Guillen having no burden, the evidence that was presented, and the context of the prosecutor's entire closing argument repeatedly noting the State's burden of proof, Guillen fails to show that no instruction could have cured any potentially resulting prejudice. *See Gouley*, 19 Wn. App. 2d at 201.

Similarly, Guillen fails to show that the prosecutor's statement in its visual slide that the element of possessing counterfeit money was not in dispute amounted to misconduct. Both responding officers testified that they immediately recognized the $100 bills as being counterfeit bills. Sergeant Finch testified that she could tell the bills were fake because they felt waxy, contained the same serial number, and were printed unevenly on the paper. Officer Cox additionally testified that the bills were "obviously counterfeit" due to their texture and appearance. RP at 138. While Guillen denied knowing the $100 bills were counterfeit, she did

not dispute either that she possessed the $100 bills or that they were indeed counterfeit $100 bills. Thus, the prosecutor's statement was based on the evidence or a reasonable inference from the evidence.

Guillen contends that, since the State presented only lay testimony about the $100 bills being counterfeit, the prosecutor's statement is false. Like the notebook and its contents, the $100 bills themselves were also admitted into evidence for the jury to examine and come to their own conclusions regarding the authenticity of the bills. Given the evidence presented, the visual slide was not improper conduct.

We hold that the challenged statements were based on the evidence or reasonable inferences from the evidence and, thus, not improper conduct.

ii. *Missing Witness Argument*

Guillen also argues that the prosecutor impermissibly suggested during closing arguments that Guillen should have presented Alonzo as a witness and, thus, improperly shifted the burden of proof. We disagree.

When a defendant chooses to defend themselves, their theory "is not immunized from attack." *State v. Contreras*, 57 Wn. App. 471, 476, 788 P.2d 1114 (1990). Under the missing witness doctrine, a prosecutor may "point out the absence of a 'natural witness'" and argue "that the absent witness's testimony would have been unfavorable to the defendant" so long as some limitations are met. *State v. Montgomery*, 163 Wn.2d 577, 598, 183 P.3d 267 (2008). First, the potential testimony is material and not cumulative. *Id*. Second, the missing witness is particularly available to the defendant. *Id*. at 598-99. Third, the witness's absence is not

satisfactorily explained. *Id.* at 599. Finally, the prosecutor's statements must not infringe on a criminal defendant's right to silence or shift the burden of proof. *Id.*

Here, the prosecutor commented about Alonzo three times in closing arguments. First, the prosecutor stated, "The defendant told you that she's from the Seattle area and a person by the name of Alonzo drove her down to the [] mall[]." RP at 214. Closely after, the prosecutor then commented, "[Guillen] also never testified about anyone else being associated with the vehicle, just her and Alonzo." RP at 214-15. Finally, during rebuttal, the prosecutor stated:

> So [] Guillen told you that she acquired the three 100-dollar bills after selling some property on [an online sale platform]. Again, it's this Alonzo person who was there to witness this transaction, and [] Guillen says that she received that money from somebody during that transaction. And that's all that you have to establish her story, is that version of events.

RP at 227. In each of these instances, the prosecutor mentions Alonzo, an individual only brought up in trial once Guillen testified, as a reference to Guillen's own testimony. Contrary to Guillen's contention, the prosecutor did not suggest that Guillen should have called Alonzo as a witness, a suggestion that would have invoked the missing witness doctrine, but, instead, repeated Guillen's own testimony which is not improper. *Contreras*, 57 Wn. App. at 476 ("When a defendant advances a theory exculpating [her], the theory is not immunized from attack. On the contrary, the evidence supporting a defendant's theory of the case is subject to the same searching examination as the State's evidence.").

Guillen relies on *State v. Stotts* to support her argument that the prosecutor invoked the missing witness doctrine.[8] However, her reliance on *Stotts* is misplaced.

---

[8] 26 Wn. App. 2d 154, 527 P.3d 842 (2023).

In *Stotts*, Division III held that a prosecutor's statements in closing improperly invoked the missing witness doctrine because, instead of merely "point[ing] out that there is no evidence to corroborate a defendant's testimony," the prosecutor instead "suggest[ed] adverse inferences from a missing witness." 26 Wn. App. 2d at 173. The prosecutor in *Stotts* invoked the missing witness doctrine by explicitly arguing that the defendant's testimony was not corroborated by an absent witness and rhetorically asking "whether it would make sense [the absent witness] would come forward to corroborate [the defendant's] testimony." *Id.* at 170, 173. Unlike the prosecutor in *Stotts*, the prosecutor here did not argue explicitly that the jury should infer Alonzo's absence as meaning he would have testified adversely to Guillen. Instead, the State only referred to Alonzo by repeating Guillen's testimony.

The prosecutor's statements did not impermissibly invoke the missing witness doctrine. Even if the prosecutor did invoke the missing witness doctrine, any error could have been cured by a jury instruction. *See Blair*, 117 Wn.2d at 491-92 (holding jury instructions regarding counsel's remarks not being evidence, the State's burden of proof, and the defendant's presumption of innocence as minimizing any shifting of the burden of proof resulting from improper missing witness statements). We hold that Guillen fails to show that the prosecutor improperly shifted the burden of proof with the statements referencing Alonzo.

Because Guillen fails to show that any of the challenged conduct amounts to prosecutorial misconduct, Guillen's contention that cumulative error occurred necessarily fails. *State v. Racus*, 7 Wn. App. 2d 287, 303, 433 P.3d 830 (2019) ("To support a cumulative error claim, the appellant must demonstrate multiple errors."). We hold that Guillen's prosecutorial misconduct claims fail.

### III. GENDER DISCRIMINATION

For the first time on appeal, Guillen argues that the prosecutor's statement in opening separately violated Guillen's constitutional right to be free from gender discrimination under the ERA.[9] The State concedes that the alleged error is a manifest constitutional error. We reject the State's concession and conclude that Guillen fails to establish any error was manifest constitutional error.

Under RAP 2.5(a), we may decline to review unpreserved errors, even those reaching constitutional issues. This rule exists to "'encourag[e] the efficient use of judicial resources. The appellate courts will not sanction a party's failure to point out at trial an error which the trial court, if given the opportunity, might have been able to correct to avoid an appeal and a consequent new trial.'" *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009) (alteration in original) (quoting *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)).

Under an exception to this general rule, a party may raise an unpreserved error by showing it constitutes a "manifest error affecting a constitutional right." RAP 2.5(a)(3). To be manifest, the party claiming such error must show actual prejudice—that the claimed error plausibly had practical and identifiable consequences at trial. *State v. Dimas*, 30 Wn. App. 2d 213, 221, 544 P.3d 597 (2024). For this part of the inquiry, we focus on assessing whether the error was "so obvious on the record that [it] warrants appellate review" and place ourselves "in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *O'Hara*, 167 Wn.2d at 99-100.

---

[9] Section 1 of article 31 of the Washington Constitution, commonly referred to as the ERA, provides that "[e]quality of rights . . . shall not be denied or abridged on account of sex." *See e.g., Guard v. Jackson*, 132 Wn.2d 660, 663, 940 P.2d 642 (1997).

Assuming without deciding that Guillen's claim implicates a constitutional right, it is not clear from the record that the prosecutor's single statement in opening actually prejudiced Guillen's case. The only argument Guillen provides regarding prejudice is noting the fact that Guillen testified that she was not the only occupant of the car. She contends that the prosecutor's statement suggested that Guillen, and not the male driver, wrote the information in the notebook.

However, the State provided significant evidence that Guillen at least had constructive possession of the notebook and some evidence that she likely wrote portions of the notebook's contents. The trial court admitted the notebook itself as well as photocopies of each page into evidence. Inside the notebook was a letter addressed to someone with the same first name as Guillen's ex-boyfriend.

Although Guillen testified that she had never seen the notebook before, her credibility was in issue. A reasonable jury could have found her testimony not credible in light of the letter, the notebook containing consistent handwriting, her lying to police about the sweatshirt being hers and then changing her story to contend that she intended to pay for it. Moreover, the jury instructions specifically told the jury "[i]n assessing credibility, you must avoid bias, conscious or unconscious, including bias based on . . . gender" and that the attorney's arguments are not evidence. CP at 30. We presume the jury followed the court's instructions given to it, and Guillen provides no facts to rebut this presumption. *State v. Kalebaugh*, 183 Wn.2d 578, 586, 355 P.3d 253 (2015). Considering the strength of the State's evidence and the instructions provided to the jury, Guillen fails to show how the prosecutor's single statement in opening had practical and identifiable consequences at her trial that could not have been corrected by a timely objection. *See O'Hara*, 167 Wn.2d at 99-100.

Thus, we hold that Guillen fails to establish the alleged error was manifest and warranting our consideration of her claim.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Guillen argues that she was denied effective assistance of counsel when her counsel stated that a defendant is innocent "until" proven guilty during voir dire, suggested the State would be able to prove its case, and failed to object to the prosecutor's misconduct. Br. of Appellant at 33. We disagree.

Both the Sixth Amendment to the United States Constitution and article 1, section 22 of the Washington Constitution guarantee defendants effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). However, we give "great deference to trial counsel's performance and begin[] the analysis with a strong presumption that counsel was effective." *State v. Crow*, 8 Wn. App. 2d 480, 507, 438 P.3d 541 (2019).

To demonstrate that counsel's performance was constitutionally ineffective, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *State v. Cienfuegos*, 144 Wn.2d 222, 226-27, 25 P.3d 1011 (2001). A defendant demonstrates deficient performance by showing that counsel's performance "fell below an objective standard of reasonableness based on consideration of all the circumstances." *Crow*, 8 Wn. App. 2d at 507. A defendant demonstrates prejudice by showing that "there is a reasonable probability that the outcome would have been different" but for counsel's deficient performance. *Cienfuegos*, 144 Wn.2d at 227. Because a defendant must establish both deficient performance and prejudicial effect, "the failure to demonstrate either prong will end our inquiry." *State v. Case*, 13 Wn. App. 2d 657, 673, 466 P.3d 799 (2020).

Guillen argues that her counsel deficiently performed by failing to object to any of the alleged instances of prosecutorial misconduct.

If the defendant's ineffective assistance of counsel claim is based on their attorney's failure to object, then they must show the objection would likely have been successful. *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Id.* Because Guillen fails to show the prosecutor's statements were improper, Guillen cannot show that there was a reasonable probability that an objection by defense counsel would have been successful. We hold that Guillen fails to meet her burden to show deficient performance by her counsel.

Additionally, Guillen argues her counsel performed deficiently by, as the prosecutor did, using the term "until" when referring to the presumption of innocence. Br. of Appellant at 33. As discussed above, because Guillen fails to show how "until" changes the presumption of innocence, we hold that Guillen fails to show that her counsel deficiently performed in using the term "until" in reference to the presumption of innocence.

Guillen fails to show that defense counsel performed deficiently, and even if her counsel had objected to each of the prosecutor's statements, she fails to show the outcome of her case

No. 58855-2-II

would have been reasonably different and fails to establish deficient performance in her

counsel's own statements. We hold that Guillen's ineffective assistance of counsel claim fails.[10]

CONCLUSION

We reverse Guillen's failure to appear conviction but affirm all other convictions and

remand to the trial court for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,

it is so ordered.

_____
Che, J.

We concur:

_____
Lee, P.J.

_____
Glasgow, J.

_____

[10] To the extent that Guillen argues that her counsel also performed deficiently by doing little to advocate for Guillen throughout trial, by failing to communicate a State's plea offer, not seeking suppression of evidence, waiving a CrR 3.5 hearing, agreeing that numerous bad acts could be admitted under Evidence Rule 404(b), stipulating to testimony from 10 witnesses who were not called to testify, not proposing jury instructions, failing to make an opening statement, and not raising a single objection, we decline to consider the merits of such arguments. Aside from using these arguments to analogize her case with that in *Stotts* for the purpose of Guillen's prosecutorial misconduct claim, Guillen provides only passing treatment of these arguments. *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290, *rev. denied* 136 Wn.2d 1015 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

31